SOUTHERN PACIFIC COMMUNICA-
TIONS CO., et al., Appellant,

v.

AMERICAN TELEPHONE AND
TELEGRAPH CO., et al.

No. 83–1102.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 20, 1984.
Decided June 26, 1984.

Frederick P. Furth, San Francisco, Cal., with whom Thomas R. Fahrner, Daniel S. Mason, Charles P. Wolff, Michael P. Lehmann, Craig C. Corbitt, San Francisco, Cal., Stephen Ailes, Richard A. Whiting, Richard Diamond and James H. Pipkin, Washington, D.C., were on the brief, for appellant. Edmund W. Burke, Washington, D.C., also entered an appearance for appellant.

George L. Saunders, Jr., Chicago, Ill., with whom Michael S. Yauch, C. John Buresh, Stewart A. Block, Washington, D.C., Howard J. Trienens and Raymond Brenner, New York City, were on the brief, for appellees. Julie D. Nelson, Washington, D.C., also entered an appearance for appellees.

Before WALD and EDWARDS, Circuit Judges, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This appeal arises out of a private antitrust action brought by Southern Pacific Communications Company and Transportation Microwave Corporation (collectively "SPCC") against the American Telephone and Telegraph Company and the local Bell operating telephone companies (collectively "AT & T"), alleging that AT & T monopolized the market for intercity business telecommunications services in the United States in violation of section 2 of the Sherman Act.[1] Following a lengthy trial, the District Court entered judgment for the defendants and dismissed the case.[2] The plaintiffs appeal from this judgment.

Figuratively speaking, this case is an appellate judge's nightmare. It not only presents an enormous record and poses some extremely difficult and controversial issues of great public importance, but also is lamentably tainted with charges of judicial bias. The central issue at trial was whether AT & T had wrongfully used monopoly power to exclude competition. Yet, in his Memorandum Opinion, the District Judge strongly expressed his personal policy view that an AT & T monopoly, and not competition, is in the public interest in the telecommunications industry. Moreover, in drafting his extremely lengthy Memorandum Opinion, the trial judge simply copied—word-for-word (including even typographical errors)—most of AT & T's proposed findings of fact and conclusions of law. Virtually every assessment of the credibility of witnesses, finding of fact and conclusion of law is in favor of AT & T. Finally, almost as if to ensure a preferred result, the trial court's judgment is supported by layer upon layer of alternative

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. Section 2 of the Sherman Act provides, in pertinent part, that "[e]very person who shall monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2 (1982). The present action was brought pursuant to § 4 of the Clayton Act, which provides in pertinent part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a) (1982).

2. *Southern Pacific Communications Co. v. AT & T,* 556 F.Supp. 825 (D.D.C.1982) (as amended Jan. 10, 1983) (hereinafter cited as Mem.Op.).

holdings on the issues of implied antitrust immunity, monopoly power, unlawful maintenance of monopoly power, injury-in-fact and proof of damages.

We would be remiss if we did not state our dismay over certain aspects of the trial court's decisionmaking in this case. We are not so naive as to suggest that trial judges should *never* use proposed findings of counsel; indeed, such a suggestion would be absurd and would belie the reality of trial practice in the United States. Nor do we mean to suggest that trial judges may never tip their hands with regard to possible final judgments in a case. We do not even mean to suggest that trial judges must be devoid of personal views about legal issues. Rather, we mean to intimate that, because of their positions of great public responsibility, District Judges often must walk a very narrow course in the performance of their jobs on the bench. A District Judge, particularly one adjudicating a case of considerable public moment, must scrupulously avoid giving the parties or the public *any* basis for perceiving that he is deciding the case otherwise than pursuant to an application of controlling law to the facts and in the exercise of his impartial, independent, considered judgment. In our view, the trial judge has raised a serious concern that he failed to heed this precept in the present case.

Judges certainly may hold personal views on law and policy and may express those views under appropriate circumstances. But the Memorandum Opinion in this case, in which the District Judge held that the antitrust laws do not aply to the defendants' conduct and alternatively that the defendants' conduct did not violate those laws, was an inappropriate place for the Judge to advocate a personal policy view contrary to the policy underlying the antitrust laws. Moreover, it is never justifiable for a judge to abdicate to a party his duty to provide a reasoned explanation for his decision. The misplaced advocacy and extensive copying of findings and conclusions that occurred in this case at least created a danger that the parties and the public would perceive that the Judge imper-missibly decided the case on the basis of his personal views rather than on the basis set forth in the Memorandum Opinion.

This is indeed precisely what has occurred in this case: SPCC's principal argument on appeal is that it was denied a fair trial because of the District Judge's legal and policy bias. Because of the questionable circumstances confronting us, we have considered this argument with the greatest of care. Despite our dismay over this matter, we have concluded, for the reasons set forth at length in Part II below, that SPCC has failed to prove that the District Judge allowed his personal, legal and policy views impermissibly to affect his decisionmaking.

Accordingly, we must affirm the District Court's judgment provided that the court's conclusions are based on correct legal standards and the court's findings of fact are not clearly erroneous. We specifically decline to abandon the "clearly erroneous" standard as SPCC advocates: we believe that the type of *de novo* review suggested by SPCC would be wholly inconsistent with the function of an appellate court. Nevertheless, in light of the special circumstances of this case, we have reviewed the District Court's findings against the record with particular, even painstaking, care. We emphasize, however, that this review is only for the purpose of determining whether the findings of the trial court must be set aside under the "clearly erroneous" standard.

We conclude that the District Court erred in holding that AT & T enjoys implied antitrust immunity with respect to the conduct at issue in this case. We also conclude that the District Court's holding that AT & T lacked monopoly power is based on an erroneous legal analysis. However, we sustain the District Court's alternative holding that AT & T did not maintain its monopoly power by engaging in predatory pricing or other exclusionary conduct. Because this holding is sufficient to affirm the District Court, we uphold the judgment in favor of AT & T without addressing the District Court's alternative holdings on the

issues of injury-in-fact and proof of damages.

## I. BACKGROUND

### A. *Competition in the Intercity Private Line Market*

Prior to 1969, AT & T had a lawful monopoly in the market for interstate, intercity private line common carrier telecommunications services.[3] AT & T provided these services through its Long Lines Department acting in partnership with the local Bell and independent operating telephone companies. These services were provided over the same nationwide network that was used to provide ordinary switched telephone services.[4]

In 1959, the Federal Communications Commission ("FCC") had liberalized the licensing of privately-owned microwave systems in *Allocation of Frequencies in the Bands Above 890 Mc*, 27 F.C.C. 359 (1959), *recon. denied*, 29 F.C.C. 825 (1960). The *Above 890* decision, however, only permitted entities to build microwave systems in order to provide telecommunications services for their own use. In 1963, Microwave Communications, Inc. ("MCI") took the next step by filing an application with the FCC to build a private microwave system between Chicago and St. Louis in order to provide point-to-point private line telecommunications services to business customers on a common carrier basis. MCI represented in its application that such a specialized carrier system was necessary to make some of the benefits of the *Above 890* decision available to small businesses by providing new and innovative specialized point-to-point private line services that were not being provided by the established carriers. The FCC granted MCI's application in 1969. *Microwave Communications, Inc.*, 18 F.C.C.2d 953 (1969), *recon. denied*, 21 F.C.C.2d 190 (1970). The *MCI* decision resulted in a deluge of applications from new "specialized common carriers," including SPCC, for authority to construct and operate facilities for similar private line communications systems between other specific city pairs. In response, the FCC instituted a rulemaking proceeding to determine "[w]hether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field." *Specialized Common Carriers*, 24 F.C.C.2d 318, 327 (1970) (Notice of Inquiry). In *Specialized Common Carriers*, 29 F.C.C.2d 870 (1971), *aff'd sub nom. Washington Utilities & Transportation Commission v. FCC*, 513 F.2d 1142 (9th Cir.), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975), the FCC declared that "a general policy in fa-

---

3. This case principally involves three types of private line services: point-to-point, FX and CCSA. The District Court described these services as follows:

> Point-to-point private line service, which plaintiffs initially sought authorization to provide, connects two customer locations with a dedicated circuit that does not require use of switching systems because the circuit is available to the customer on a continuing and exclusive basis. In contrast, foreign exchange (FX) and common control switching arrangement (CCSA) services, which are involved in certain of plaintiffs' interconnection charges, require dedicated intercity circuits, but also provide a connection into a switching system, located in a telephone company switching center.

Mem.Op. at 855 n. 11 (citations to record omitted). For a more detailed description of FX and CCSA services, see Mem.Op. at 986 nn. 191–192.

4. These services comprise local exchange telephone service and long distance service. The District Court described these services as follows:

> Local exchange telephone service is the ordinary service used in nearly all homes and businesses. From a technical standpoint, it involves a wire connection from the telephone set to a switching system in a nearby telephone company switching center that is in turn connected by transmission trunks to switching systems in other switching centers within the exchange area.
>
> Long distance service operates in a manner similar to local exchange service but typically involves a two-step process in which the user first gains access to the local switching system through a dial tone and then requests access to the long distance toll switching system (in many cases the exact same switch) by dialing an area code plus the number of the telephone the calling party wishes to reach.

Mem.Op. at 855 nn. 9–10 (citations to transcript omitted).

vor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity." 29 F.C.C.2d at 920.

The *Specialized Common Carriers* decision left a number of significant questions unanswered. First, the decision did not specify what services the "specialized common carriers" were authorized to offer in the "specialized communications field," but noted merely that they would serve "evolving, new, diverse and specialized needs in a dynamic, rapidly growing market." 29 F.C.C.2d at 912. Second, the decision did not indicate what competitive response AT & T would be allowed to make to the entry of the specialized common carriers into the market. Rather, the Commission stated that:

> We do not find it necessary at this time and on this record to speculate concerning the manner in which the existing carriers may seek to respond to competitive conditions that may emerge in the market for new and developing specialized communications services. We do, however, stress our objective to promote and maintain an environment within which existing and any new carriers shall have an opportunity to compete fairly and fully in the sale of specialized services. Our rate-making and regulatory policies and practices will be appropriately adapted to accomplish this objective. There is no reason to deny the public the benefits that may derive from active and vigorous participation by the Bell System and Western Union in this market, so long as their participation is not a burden upon or significantly detrimental to their other services. Thus, it is our intention

to permit the existing carriers to price their competitive services in a fashion that will realistically and reasonably reflect economic advantages, if any, that are inherent in the plant and operations of those carriers. Moreover, we subscribe fully to the views of our staff, endorsed by the Department of Justice, that there should not be any "protective umbrella" for the new entrants or "any artificial bolstering of operations that cannot succeed on their own merits" (*Notice*, paragraph 44).

29 F.C.C.2d at 915.[5]

Finally, the decision did not dictate the terms and conditions under which the specialized common carriers would be entitled to interconnect with the Bell system. The specialized common carriers proposed to provide intercity services primarily by microwave transmission. However, it was neither technically nor economically practical to carry a signal by microwave directly to a customer's premises. To serve customers located in urban areas, it was necessary for the specialized common carriers to interconnect their intercity microwave systems with local distribution facilities. These local distribution facilities were only obtainable from the local telephone companies, which, in nearly all locations served by SPCC, were owned and controlled by AT & T. In addressing this critical issue of interconnection, the Commission stated only that:

> We reaffirm the view expressed in the *Notice* (paragraph 67) that established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reason-

---

5. AT & T made competitive price responses both to the *Above 890* decision and to the *MCI* and *Specialized Common Carriers* decisions. Four months after the *Above 890* decision, AT & T filed a new tariff, called Telpak, that offered substantial discounts for bundles of 60 channels (Telpak C) or 240 channels (Telpak D). Telpak was designed to eliminate the incentive for entities to construct private microwave systems for their own use where AT & T facilities were available. Similarly, following the *Specialized Common Carriers* decision, AT & T filed a new tariff, called Hi/Lo, that substantially reduced the rate for single-channel lines connecting high-density centers, where the specialized common carriers were likely to compete. Two years later, the FCC found Hi/Lo to be unreasonable. AT & T then filed a replacement tariff, known as the Multi-Schedule Private Line ("MPL") tariff, that similarly offered low rates on high-density routes. After each of the above tariffs was filed, the FCC suspended the tariff for the then maximum period of 90 days. After that period, each tariff went into effect and remained in effect throughout the lengthy FCC investigation of its reasonableness.

able terms and conditions to be negotiated with the new carriers, and also afford their customers the option of obtaining local distribution service under reasonable terms set forth in the tariff schedules of the local carrier. Moreover, as there stated, "where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors."

29 F.C.C.2d at 940 (footnote omitted).

As the new specialized common carriers began to enter the market, disputes arose among these new carriers, AT & T and the FCC concerning the types of services that the new carriers were authorized to provide, the kinds of interconnections to which they were entitled, the terms and conditions upon which such interconnections would be provided, and the nature of the competitive rate response that AT & T would be permitted to make in its own private line tariffs. The subjects of these disputes form the basis of the present antitrust suit.

## B. *The Parties*

The plaintiffs in this case are SPCC and Transportation Microwave Corporation. The defendants are AT & T and the 24 Bell operating companies.

SPCC was formed in January 1970 as a wholly owned subsidiary of the Southern Pacific Company to provide business and governmental private line communications services over its own intercity microwave network. Shortly thereafter, SPCC filed initial applications with the FCC, seeking to construct and operate specialized common carrier microwave systems between Seattle and San Diego and between Los Angeles and St. Louis. The FCC granted these applications following its decision in the *Specialized Common Carriers* inquiry, and SPCC commenced commercial operations on December 26, 1973. Transportation Microwave Corporation is a 95%-owned subsidiary of the Southern Pacific group.

AT&T, through its Long Lines Department acting in partnership with the Bell and independent operating telephone companies, provides interstate and intercity telecommunications services in competition with SPCC. Each of the Bell operating companies possesses a lawful, exclusive franchise or monopoly in the geographic area in which it provides service.

## C. *The Proceedings Below*

SPCC filed its complaint in this action on March 27, 1978, alleging violations of the Sherman Act and seeking, ultimately, $230.2 million in damages, trebled to $690.6 million pursuant to section 4 of the Clayton Act. SPCC's complaint contained a demand for trial by jury. AT&T promptly filed a motion to dismiss, arguing that the challenged conduct was subject to pervasive regulatory control and hence was immune from antitrust scrutiny. The District Court, Judge Richey presiding, rejected this argument and denied AT&T's motion to dismiss on July 2, 1979. The parties engaged in extensive discovery between 1979 and 1981. In February 1982, SPCC waived its earlier demand for a jury trial in order to try the case before Judge Richey. The case was submitted for trial on the charge that AT&T had possessed monopoly power and had misused that power during the period from 1968–1978 through conduct alleged to violate section 2 of the Sherman Act.

Trial commenced on May 10, 1982, and lasted 33 trial days. SPCC argued at trial that AT&T had refused to accept the FCC mandate permitting competition in the intercity private line market. Plaintiffs also contended that AT&T had used its monopoly power over prices and its control of local distribution facilities unlawfully to foreclose competition. AT&T conceded that it disagreed in principle with the FCC's policies because it believed that these policies threatened to destroy the rate structure that had been designed to foster the universal availability of telephone service. AT&T argued, however, that it opposed these policies only to the extent of speak-

ing out against them. According to AT&T, it was committed to conducting its business fully in accordance with the FCC's decisions and orders and to providing competitors with access to its essential facilities on fair terms to the extent that doing so was consistent with its public responsibilities. Furthermore, AT&T argued, to the extent that the FCC permitted it to compete, it did so fully but fairly, using its superior efficiency due to economies of scale and scope to provide service at a lower cost and price than could be provided by SPCC.

SPCC completed its presentation of evidence, including the testimony of 24 witnesses and the introduction of approximately 1,400 exhibits, on June 14, 1982. On June 8, AT&T filed a motion for involuntary dismissal under rule 41(b) of the Federal Rules of Civil Procedure. On June 21, the District Court announced its decision to defer ruling on AT&T's motion until it had heard all of the evidence. Between June 23 and July 2, AT&T presented the testimony of 147 witnesses[6] and introduced over 7,900 exhibits. SPCC then presented rebuttal evidence, consisting of the testimony of nine witnesses and the introduction of 326 exhibits, and AT&T then introduced 23 exhibits in surrebuttal evidence. As the conclusion of the trial, the District Court requested proposed findings of fact and conclusions of law from both parties. SPCC submitted 375 pages of proposed findings and conclusions and AT&T submitted 486 pages of proposed findings and conclusions. Finally, on July 19, 1982, the trial court heard closing arguments.

Five months later, on December 21, 1982, the District Court issued a Memorandum Opinion and Order entering judgment for the defendants and dismissing the case with prejudice. The Memorandum Opinion, 605 typewritten pages long, is reprinted in 275 pages of the Federal Supplement. The opinion is overwhelmingly copied verbatim from AT&T's proposed findings of fact and conclusions of law. According to the uncontradicted computation of SPCC, the District Court adopted 730 of the 746 paragraphs of AT&T's proposed findings and conclusions; on a line-by-line basis (excluding quotations), 80.5% of the opinion is copied from AT&T's proposed findings and conclusions, 4.4% is copied from SPCC's proposed findings and conclusions (on all nonsubstantive matters), and 15.1% is original material. *See* Appellants' Opening Brief at 20 & n. 15; *see also* VI Record Excerpts at tab 97 (copy of Memorandum Opinion with each line attributed to source). The District Court even copied dozens of typographical errors from AT&T's submission; these were corrected before publication by an order filed January 10, 1983. In certain of the original portions of the Memorandum Opinion, the District Judge strongly expressed his agreement with AT&T's view that the FCC's decisions opening the telecommunications industry to competition were inimical to the public interest.

## II. The Judicial Bias Issue

SPCC's central argument on this appeal is that it was denied a fair trial because of the District Judge's bias. SPCC alleges that the Judge was biased because he approached the trial with the firm personal beliefs that an AT&T monopoly is in the public interest and that the antitrust laws should not, and do not, apply to AT&T.[7]

6. Most of the testimony in this case was presented in written form. Only 47 of AT & T's witnesses actually appeared in court. *See* Mem.Op. at 851 n. 7.

7. The District Judge expressed his beliefs most prominently in the course of the following discussion of implied antitrust immunity in the "Conclusion" section of his Memorandum Opinion:

Under the controlling decisions of the Supreme Court, it is undisputed that matters subject to a pervasive scheme of public utility or common carrier regulation are not subject to the antitrust laws. *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 300–01, 305, 309, 83 S.Ct. 476, 479, 482, 484, 9 L.Ed.2d 325 (1963); *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 387–89, 93 S.Ct. 647, 660, 34 L.Ed.2d 577 (1973); *United States v. Radio Corp. of America,* 358 U.S. 334, 348–49, 79 S.Ct. 457, 465, 3 L.Ed.2d 354 (1959). Based on the evidence adduced at trial, the Court finds that all of the rates and practices of defendants challenged by SPCC in

SPCC further contends that the District Court's Memorandum Opinion—extensively copied from AT&T's proposed findings of fact and conclusions of law, and adverse to SPCC on all significant factual and legal questions—merely gave vent to the Judge's personal beliefs, and, consequently, failed to reflect his impartial application of the antitrust laws to the facts of the case. Thus, according to SPCC, we should vacate the opinion of the District Court and re-mand the case for a new trial, without consideration of the evidence. Alternatively, according to SPCC, we should abandon the "clearly erroneous" standard of review, and simply review the record to determine whether the Judge's convictions substantially influenced his judgment.

We must emphasize at the outset the narrow focus of SPCC's argument. Although a claim is made that plaintiffs were denied a fair trial, SPCC does not allege

> this case are subject to pervasive federal and state regulatory control under a public interest standard that is quite different from and inconsistent with the application of the antitrust laws. Though this reverses the Court's earlier 1979 ruling on a Motion to Dismiss, it is clear from all of the evidence now before this Court with respect to this plaintiff, that every action complained of in this case could have or should have been handled by the appropriate regulatory bodies, which responsibility the regulators miserably mishandled or failed to handle. What the FCC actually did over the years was talk about competition (in reality contrived) in order to achieve deregulation which has and will be shown to be contrary to the best interests of millions of Americans throughout the country and by those outside the profitable big city areas with a resultant loss of service, quality, and higher costs to those least able to afford this now essential service. It is clear that defendants could not make one penny more than what the various regulators allowed them. Indeed, AT & T had a double burden—not only could their rates not be too low, but neither could they be too high. The states have done a particularly good job in regulating the defendants in order to insure the highest quality of service at the lowest possible cost for all of their citizens. There are many instances in which AT & T would seek a rate increase from the state, only to be denied all of it or part of it. The states were also very effective in regulating the interconnection problems as well. The picture became cloudy on the interconnection matter only because the FCC attempted, and quite successfully, to obtain jurisdiction over intrastate matters. Whether this was in the public interest will remain for another day. The bottom line of "public interest" has actually been construed as what some powerful interests in this country want as distinguished from what the public can afford, namely, safe, reliable service to everyone (instead of creamskimming the big city areas where profits are maximized) at the lowest possible cost to *all* and particularly those least able to afford telecommunications service, which should be our continued standard. This Court believes that the antitrust

> laws were never intended to destroy an essential public utility such as we have here. It may be necessary for Congress and the Justice Department to re-examine the problems herein discussed and to bring about the return of responsible regulation so that there will be no more contrived competition in profitable areas only. This Court believes that sound and honest regulation of telecommunications at the federal and state level is our only guarantee of access to this necessity throughout the *whole* country and not just part of it. Regulation in this area of telecommunications up until the 1970's at the federal and state levels has served this country well and it is hoped that sometime in the near future it will again do its proper job without abdication to the greed of a few, no matter how big or small.
>
> It is necessary to mention the FCC again. It put the Specialized Common Carriers into business for the benefit of a few without taking into account the myriad of problems to our people and our national security. It was the FCC that never found TELPAK (C & D) unlawful for over *20* years, as well as delayed making other very important decisions. It cannot be successfully disputed that whatever the FCC mandated throughout the relevant period of this case, that AT & T was obligated to, and did in fact, follow, no matter whether it made any sense in economics or law. It was primarily the FCC staff during this entire period, after permitting the Specialized Common Carriers entry into the market in the name of competition (really contrived), whose performance, was, to say the least, totally unprofessional and inadequate by virtue of the likes of Messrs. Cox, Hinchman, Tucker, and Scott. It was a result of their actions (or inaction) as well as a thin majority of the Commissioners in the 60's and 70's that has subjected AT & T to many lawsuits in the antitrust field now pending today. Had the FCC not engaged in its usual regulatory lag and dealt forthrightly and properly with the problems as they arose, then few, if any, of the cases would now be before the antitrust Courts, such as this one.
>
> Mem.Op. at 1095–97 (emphasis in original) (footnotes omitted).

that the District Judge in any way interfered with plaintiffs' efforts to present their case. To the contrary, SPCC concedes that the Judge never foreclosed it from engaging in discovery, introducing documentary or testimonial evidence, engaging in cross-examination, presenting legal arguments, or citing applicable legal precedents. Thus, as SPCC also concedes, it was able to create a full, complete record for us to review. Furthermore, although SPCC asserts a charge of bias, there is no claim that the District Judge was biased in the sense of having adjudged the facts in advance of hearing the case. *Cf. Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 591 (D.C.Cir.1970). Rather, SPCC asserts that the District Judge was biased only in the sense that he held firm views concerning law and policy and decided the case on the basis of these views, thus depriving SPCC of an impartial judgment.[8]

## A. *Views on Law or Policy*

■ It is well established that the mere fact that a judge holds views on law or policy relevant to the decision of a case does not disqualify him from hearing the case.[9] *See, e.g., Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1174 (D.C.Cir.1979) ("Administrators, and even judges, may hold policy views on questions of law prior to participating in a proceeding."), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980); *id.* at 1177 (Leventhal, J., concurring) ("even judges are not disqualified merely because they have previously announced their positions on legal issues"); *United States v. Haldeman*, 559 F.2d 31, 136 n. 332 (D.C.

**8.** SPCC alleged at oral argument that the District Judge also was biased in the sense that he harbored a personal animus against SPCC as a party. *See* Transcript of Oral Argument at 7-8. This allegation is based solely on statements the District Judge made to the effect that the specialized common carriers *as a class* were interested only in "creamskimming the big city areas where profits were maximized" and not in providing "safe, reliable service to everyone ... at the lowest possible cost to *all* and particularly those least able to afford telecommunications service." Mem.Op. at 1096 (emphasis in original); *see* Transcript of Oral Argument at 8. We do not at all find that these and similar statements manifest a personal animus against SPCC, but only that they reflect the District Judge's policy views. Our review of the trial record provides no support for SPCC's allegation of *personal animus*. Indeed, at the conclusion of the trial, lead counsel for SPCC thanked the District Judge for the "great deal of goodwill toward the parties" that he had shown "throughout this case." Trial Transcript at 6048. We also find it significant that, after several years of pre-trial proceedings, SPCC waived its right to trial by jury to have the case tried before the District Judge, and that SPCC never sought to have the District Judge disqualified for personal bias.

**9.** The issue in the present case is whether the appellants were denied a fair trial because of the District Judge's alleged bias, and not whether the District Judge should have disqualified himself for bias. Judicial disqualification in the federal courts is governed by two sections of the Judicial Code, 28 U.S.C. §§ 144, 455 (1982). Section 144 provides in pertinent part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding. 28 U.S.C. § 144 (1982). Section 455 provides in pertinent part that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," *id.* § 455(a), and "also" shall disqualify himself "[w]here he has a personal bias or prejudice concerning a party," *id.* § 455(b)(1). These sections establish a more stringent standard for disqualification than is required by the right to a fair trial guaranteed by the due process clause. *See United States v. Haldeman*, 559 F.2d 31, 130 n. 276 (D.C.Cir.1976) (en banc) (per curiam), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *accord In re IBM Corp.*, 618 F.2d 923, 932 n. 11 (2d Cir.1980); *see also FTC v. Cement Institute*, 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948) (most matters relating to judicial disqualification do not rise to a constitutional level); *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) ("All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion."). Thus, a determination that a judge is not disqualified for bias necessarily includes a determination that the right to a fair trial is not violated by the judge's presiding over the case.

Cir.1976) (en banc) (per curiam) ("although fixed, an opinion on the law is not disqualifying"), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Indeed, we can barely conceive of a judge coming to a case without holding at least certain preconceptions that may affect his approach to the case. "The human mind, even at infancy, is no blank piece of paper. We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are prejudices." *In re J.P. Linahan, Inc.,* 138 F.2d 650, 651 (2d Cir.1943). If a judge approached every case completely free of preconceived views concerning the relevant law and policy, we would be inclined not to applaud his impartiality, but to question his qualification to serve as a judge.[10]

■ Although it is both understood and accepted that judges do not approach a case empty-headed, it is also presumed that a judge will not prejudge any case. In each new case the judge confronts a new factual context, new evidence, and new efforts at persuasion. As long as the judge is capable of refining his views in the process of this intellectual confrontation, and maintaining a completely open mind to decide the facts and apply the applicable law to the facts, personal views on law and policy do not disqualify him from hearing the case. The test may be stated in terms of whether the judge's mind is "irrevocably closed" on the issues as they arise in the context of the specific case. *See FTC v. Cement Institute,* 333 U.S. 683, 701, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948); *see also Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976) ("Nor is a decisionmaker

disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.' "); *United States v. Haldeman,* 559 F.2d 31, 136 (D.C.Cir. 1976) (en banc) (per curiam) ("a judge's comment is disqualifying only if it connotes a fixed opinion—'a closed mind on the merits of the case.' "), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

In the present case, SPCC argues both that the District Judge held firm views about the policies and issues involved before hearing the case, and that his mind was irrevocably closed. We conclude, however, that SPCC has failed to establish either prong of this argument.

■ AT&T strongly disputes SPCC's contention that the District Judge held his policy or legal views prior to hearing the case, and argues that, to the contrary, the Judge developed his views during the course of the trial in response to the arguments and evidence presented by both parties. It seems clear that the Judge, at minimum, did not initially believe that the antitrust laws are inapplicable to AT&T's allegedly anticompetitive conduct, for, on July 2, 1979, the Judge entered a pre-trial order rejecting AT&T's motion to dismiss the case on the basis of implied antitrust immunity. In that order, the Judge noted that "[i]t is consistent with the FCC's general goals for the specialized communications market, as well as with the agency's determinations in particular cases, that the antitrust laws and the Communications Act may be applied simultaneously and complementarily." Order at 8. The Judge explained his change of position between the pretrial order and the final decision as being due to the failure of the "proof adduced at this trial" to substantiate the "facts

10. *Cf. Laird v. Tatum,* 409 U.S. 824, 835, 93 S.Ct. 7, 14, 34 L.Ed.2d 50 (1972) (Memorandum of Mr. Justice Rehnquist) ("Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."); *In re J.P. Lina-*

*han, Inc.,* 138 F.2d 650, 652 (2d Cir.1943) ("An 'open mind,' in the sense of a mind containing no preconceptions whatever, would be a mind incapable of learning anything, would be that of an utterly emotionless human being, corresponding roughly to the psychiatrist's descriptions of the feeble-minded.").

alleged in the pleadings." Mem.Op. at 1096 n. 341. In other words, far from initially holding a firm belief that the antitrust laws did not apply to AT&T, the trial judge initially held the view that the antitrust laws *did* apply to AT&T, and adopted the contrary view only after hearing the evidence. This hardly supports SPCC's charge of bias.

Moreover, we have examined the arguments and evidence presented in this case, and find AT&T's position that the District Judge developed his policy views as well as his legal views during the course of the trial to be at least highly plausible. The merits and demerits of the FCC's decision to allow competitive entry by the specialized common carriers were extensively debated by counsel during the trial. Indeed, SPCC itself, in an attempt to prove AT&T's anticompetitive intent, submitted documentary evidence setting forth AT&T's reasons for opposing the FCC's decision. One such document, a speech given by the then Chairman of the Board of Directors of AT&T, John D. deButts, to the annual convention of the National Association of Regulatory Utility Commissioners on September 30, 1973, is quoted in its entirety in the Memorandum Opinion. *See* Mem.Op. at 894–902. A comparison of that speech with the views expressed by the District Judge in the "Conclusion" section of the Memorandum Opinion[11] reveals a striking similarity. This strongly suggests to us that the Judge developed his policy views during the trial. Most importantly, SPCC fails to offer any convincing evidence that the District Judge held his policy views prior to hearing the case.

■ Even if we were to assume that the trial judge began the case with certain firmly held views, SPCC has failed to establish that the Judge held these views with an "irrevocably closed" mind. Once

again, the evidence suggests the opposite. The first such evidence is the Judge's denial of AT&T's pretrial motion to exclude SPCC's FX and CCSA[12] claims from the case, and his denial of AT&T's motion at the close of SPCC's case for involuntary dismissal under rule 41(b). These actions are indicative of a judge who was fully prepared to hear all of the evidence before reaching a final decision, not a judge whose mind was irrevocably closed to persuasion. Second, the Judge repeatedly stated throughout the trial that he had not yet reached a conclusion on the merits of the case. Finally, as noted earlier, the Judge never foreclosed SPCC from engaging in discovery, introducing documentary or testimonial evidence, engaging in cross-examination, presenting legal arguments, or citing applicable legal precedents.

If the Judge was as biased as claimed by SPCC, it is unlikely that he would have been so consistently evenhanded in his administration of the trial proceedings. To assume bias in the face of such a fair trial is to conjure up a most duplicitous mind; we will not idly indulge such speculation about an officer of the law.

## B. *Disagreement with Applicable Law or Policy*

We recognize that SPCC's argument goes beyond the assertion that the District Judge held certain views on law and policy with an irrevocably closed mind. SPCC further argues in essence that the Judge ignored the applicable antitrust law and simply decided the case on the basis of his view that an AT&T monopoly is good and competition against AT&T is bad. Once the Judge reached his decision in this manner, according to SPCC, he copied AT&T's proposed findings of fact and conclusions of law without further consideration in order to render his decision "appeal proof."[13]

---

11. *See* note 7 *supra.*

12. For a brief description of FX and CCSA, see note 3 *supra.*

13. In its brief and at oral argument, SPCC repeatedly referred to remarks made by the Dis-

trict Judge at a hearing on a post-judgment motion to the effect that his decision was "appeal proof" and would be affirmed. SPCC would have us believe that these remarks indicate that the District Judge deliberately and deviously set about to render a biased decision impervious to attack. SPCC neglected to quote

■ It is clear that the District Judge did hold the view that AT&T's former monopoly in private line telecommunications was in the public interest and that competitive entry into this market was contrary to the public interest. This view is inconsistent with the determination that the FCC made in *Specialized Common Carriers*, 29 F.C.C.2d 870 (1971), *aff'd sub nom. Washington Utilities & Transportation Commission v. FCC*, 513 F.2d 1142 (9th Cir.), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975), that competitive entry into this market *is* in the public interest. The FCC's determination was upheld by the Ninth Circuit and was given broad effect by this court in *AT&T v. FCC*, 539 F.2d 767, 773-74 (D.C.Cir.1976). The District Judge's proper role in deciding this case was to apply the antitrust laws to the facts *given* this policy of allowing competition. It was not part of his official role in deciding this case to pass judgment on, or even to express his personal views concerning, the FCC's policy decision to allow competition.

■ It is well established, however, that a judge is not disqualified merely because he personally disagrees with the policy underlying a law that he is bound to apply in a case. As Judge Leventhal noted, "[i]n fulfilling the functions of applying or considering the validity of a statute, or a government program, the judge endeavors to put aside personal views as to the desirability of the law or program, and he is not disqualified because he personally deems the program laudable or objectionable." *Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1175 (D.C.Cir.1979) (Leventhal, J., concurring) (footnotes omitted), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).[14] In the present case, however, it is alleged that the District Judge not only disagreed in the context of this case with the policy promoted by the antitrust laws, but also that instead of putting his personal views aside he allowed those views to dominate his judgment. SPCC principally relies on three factors to support this latter allegation: the statements made by the Judge in his Memorandum Opinion, the fact that the Judge largely copied his Memorandum Opinion from AT&T's proposed findings of fact and conclusions of law, and the fact that virtually every determination of credibility, finding of fact and conclusion of law is in favor of AT&T. For the reasons discussed below, we do not find these factors sufficient to overcome the strong presumption that judges in deciding cases do not substitute their personal views for controlling law.

### 1. *Statements in the Memorandum Opinion*

■ SPCC argues that we can deduce from the District Judge's policy statements in the Memorandum Opinion that these views were the basis for the Judge's decision. We disagree. It is true that the Judge interspersed comments about his view of the public interest with his analysis of one of the issues in this case, the issue

the Judge's remarks in context, however. At the time the remarks were made, the District Judge was urging the parties to settle the case. The District Judge suggested to SPCC that although its intention to appeal was "perfectly proper," it would make more sense to settle instead because "the decision is appeal proof ... unless the Court of Appeals is going to overrule 100 years of law about findings being clearly erroneous ..., and I don't see how in the world in light of this record it could be." Transcript of Hearing at 112 (Mar. 30, 1983). We do not find these remarks to be inappropriate in context, and we do not read them necessarily to indicate more than that the District Judge believed that his decision fully documented a total failure by SPCC to prove its case.

**14.** Thus, for example, a judge who was vehemently opposed to the continuation of the Vietnam War was not disqualified from determining whether a draftee had been unlawfully inducted under the selective service laws. *Lawton v. Tarr*, 327 F.Supp. 670 (E.D.N.C.1971). Similarly, a judge whose Church was opposed to the proposed Equal Rights Amendment and to extension of its ratification deadline was not disqualified from determining whether a state legislature may rescind its prior adoption of the amendment and whether Congress may extend the ratification period after the time originally designated by Congress had elapsed. *Idaho v. Freeman*, 478 F.Supp. 33 (D.Idaho 1979).

of implied immunity. But the Judge did not base even his conclusion that AT&T enjoys implied immunity from the antitrust laws on his notions of the public interest, but rather on his conclusion—with which we disagree—that AT&T was subject to a pervasive scheme of regulation. One of the most troublesome comments that the Judge made was that he "believes that the antitrust laws were never intended to destroy an essential public utility such as we have here." Mem.Op. at 1097. We interpret this comment, however, merely to be a restatement of his conclusion that antitrust immunity can be implied from the scheme of public utility regulation applicable to AT&T.

In any case, even if the trial judge's views of the public interest *did* influence his judgment on the issue of implied antitrust immunity, the decision does not rest on the disposition of that issue.[15] Rather, the Judge went on to hold in the alternative that, even if the antitrust laws *do* apply, SPCC has failed to prove that AT&T unlawfully maintained monopoly power through anticompetitive conduct. It is solely on the basis of that holding that we affirm the District Court's judgment, and we find no evidence that the Judge's policy views impermissibly influenced that holding.

### 2. *Copied Findings of Fact and Conclusions of Law*

■ SPCC also argues that the fact that the District Judge overwhelmingly copied his Memorandum Opinion from AT&T's proposed findings of fact and conclusions of law supports the conclusion that the Judge's decision was based on his personal policy views and not on impartial application of the antitrust laws to the facts of the case. The argument, as we understand it, is that we cannot assume that the Judge actually based his judgment on the antitrust analysis contained in the Memorandum Opinion, because we cannot know whether he adopted that analysis after full

consideration or merely copied it mechanically.

The short answer to this argument is that, given the absence of clear evidence to the contrary, we must presume that the Judge adopted these findings and conclusions after full consideration. In *United States v. Crescent Amusement Co.*, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944), the Supreme Court noted:

> The defendants finally object to the findings on the ground that they were mainly taken verbatim from the government's brief. The findings leave much to be desired in light of the function of the trial court. But they are nonetheless the findings of the District Court. And they must stand or fall depending on whether they are supported by the evidence.

*Id.* at 184–85, 65 S.Ct. at 260 (citation omitted); *accord United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964); *Afshar v. Department of State*, 702 F.2d 1125, 1144 (D.C.Cir.1983); *Valentino v. United States Postal Service*, 674 F.2d 56, 60–61 n. 2 (D.C.Cir.1982). Indeed, in *Valentino* this circuit explicitly rejected the suggestion that the District Court's substantial acceptance of the prevailing party's proposed findings warrants departure from the "clearly erroneous" standard of review. 674 F.2d at 60–61 n. 2.

SPCC argues that this case is distinguishable from *Crescent Amusement Co., El Paso Natural Gas Co., Afshar, Valentino* and similar cases because of the sheer extensiveness of the copying. We find this argument unpersuasive. Proportionately, the extent of the copying was the same or less in the present case than in many others. The total number of pages copied reflects the size of the case more than the degree of abdication of the judge's responsibility for opinion writing.

■ Even apart from our presumption of regularity, however, we find that there is reason to believe that the Memorandum

---

**15.** Indeed, the Judge addressed the issue of implied antitrust immunity for the first time in the "Conclusion" section of the Memorandum Opinion, almost as an afterthought.

Opinion may reflect the actual thinking of the District Judge on the issues. First, counsel for AT&T explained at oral argument that AT&T's proposed findings of fact and conclusions of law were written to reflect the views of the District Judge that had been freely expressed throughout the trial in response to the testimony of the witnesses, the submissions of documentary evidence and the arguments of the parties. Our review of the record convinces us that there is considerable merit to this explanation. To an extent, therefore, AT&T merely performed a stenographic function. Moreover, we note that the District Judge did add a not insignificant amount of original material, including supplemental determinations of credibility, findings of fact and conclusions of law. This original material is interspersed throughout AT&T's submissions. This indicates to us that the trial judge did not mechanically copy AT&T's proposed findings and conclusions, but rather considered them and elaborated upon them where he considered it necessary.

■ Finally, we note that careful appellate review provides some safeguard against adoption of findings and conclusions that reflect excessive zeal of advocacy. Courts of appeals are able independently to review the legal analysis of a trial court's opinion for error, regardless of whether that analysis was written in the first instance by the District Judge or by the prevailing party. And, as long as the court of appeals has a full record—which SPCC concedes we do in this case—the court of appeals can "examine[ ] the decision with special care" for clear error in the findings of fact. *Valentino v. United States Postal Service,* 674 F.2d at 60 n. 2. We may contrast this situation with the situation in *Crandell v. United States,* 703 F.2d 74 (4th Cir.1983), one of the cases principally relied upon by SPCC. In *Crandell,* all of the findings in the district court's memorandum opinion relating to two key issues were lifted virtually verbatim from a report prepared by a government witness. 703 F.2d at 76. During the trial, the District Judge had prevented the

plaintiff from effectively cross-examining this witness. *Id.* In contrast, as SPCC concedes, the District Judge in the present case never foreclosed SPCC from presenting its case and developing a full record for review.

Nevertheless, we wish to make clear that we cannot endorse the District Judge's action in extensively copying the proposed findings of fact and conclusions of law prepared by counsel for AT&T. As the Supreme Court noted in *El Paso Natural Gas Co.,* this practice "is an abandonment of the duty and the trust that has been placed in the judge." 376 U.S. at 657 n. 4, 84 S.Ct. at 1047 n. 4 (quoting J. Skelly Wright, Seminars for Newly Appointed United States District Judges 166 (1963)). As the present case illustrates, the parties, the public and the reviewing court can never be certain that the judge actually decided the case on the grounds given in the copied Memorandum Opinion. Confidence in the integrity of the judicial process inevitably suffers when judges succumb wholesale to this practice.

### 3. *One-sided Findings and Conclusions*

■ Finally, SPCC argues that it is difficult to credit to anything except judicial bias the fact that virtually every determination of the credibility of witnesses, finding of fact and conclusion of law in the Memorandum Opinion is in favor of AT&T. We conclude that the statistical one-sidedness of the trial court's evidentiary, factual and legal rulings simply cannot be used to support an inference of judicial bias. As the Second Circuit has noted:

> A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias. Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest.

*In re IBM Corp.,* 618 F.2d 923, 929 (2d Cir.1980) (rejecting IBM's argument that

the disproportionate number of rulings by the trial judge against IBM and in favor of the Government constituted evidence of judicial bias).

This position is also supported by the Supreme Court's decision in *NLRB v. Pittsburgh Steamship Co.*, 337 U.S. 656, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949). In that case, a trial examiner without exception had found the witnesses for the company untrustworthy and those for the union reliable, and the Board had adopted the examiner's findings. The court of appeals held that this fact alone showed bias: "It is enough to say that the unvarying repudiation of every witness for the petitioner because of falsity, evasion or faint recollection, along with the consistent exaltation of every union witness as truthful, forthright and accurate, destroys completely any confidence that might otherwise be placed in the findings of the trial examiner and stamp[s] them as arbitrary." 337 U.S. at 658, 69 S.Ct. at 1285 (quoting *Pittsburgh Steamship Co. v. NLRB*, 167 F.2d 126, 129 (6th Cir.1948)) (brackets in original). The Supreme Court reversed, holding that "total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact." *Id.* at 659, 69 S.Ct. at 1285.

### C. *Case Law Relied on by SPCC*

SPCC relies primarily on five cases to support its argument that the District Judge should be reversed for bias: *Crandell v. United States*, 703 F.2d 74 (4th Cir.1983); *Nicodemus v. Chrysler Corp.*, 596 F.2d 152 (6th Cir.1979); *Faulkner Radio, Inc. v. FCC*, 557 F.2d 866 (D.C.Cir. 1977); *Reserve Mining Co. v. Lord*, 529 F.2d 181 (8th Cir.1976); and *Knapp v. Kinsey*, 232 F.2d 458 (6th Cir.), *cert. denied*, 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956).

In *Faulkner Radio*, this court remanded a case to the FCC because the administrative law judge, in resolving a conflict between the testimony of two parties who were lawyers and the testimony of opposing witnesses who were non-lawyers, apparently acted on the assumption that the FCC accords greater weight to the testimony of lawyers than to that of non-lawyers. Although the appellant couched its argument in terms of "bias," the court remanded because it considered it likely that the judge's credibility determinations were "predicated upon a material error of law." 557 F.2d at 870. Thus, *Faulkner Radio* does not suggest that we should vacate the opinion below and remand the present case for a new trial without consideration of the evidence, as SPCC argues, but only that we should carefully review the District Judge's determinations of credibility and findings of fact to make certain that they, too, are not predicated upon material errors of law.[16]

In each of the other four cases relied on by SPCC, the court of appeals held that the district judge's *conduct during the trial* deprived the losing party of due process. This conduct consisted in part of statements made by the judge indicating bias, but also in each case involved significant—even egregious—interference by the judge with the attempts of the losing party to present its case. Indeed, in three of the cases the court of appeals concluded that the district judge had "simply assumed the role of an advocate" for the prevailing party. *Crandell*, 703 F.2d at 77; *see Reserve Mining Co.*, 529 F.2d at 185 ("Judge Lord seems to have shed the robe of the judge and to have assumed the mantle of the advocate."); *Knapp*, 232 F.2d at 467 (dis-

---

**16.** SPCC argues that many of the District Court's determinations of credibility in the present case were predicated on impermissible grounds. We have considered SPCC's allegations, and conclude that the District Court fully supported each determination of credibility critical to its holding on the issue of unlawful maintenance of monopoly power on the basis of legitimate considerations, such as demeanor, objectivity, expertise, experience, and the logic of the testimony. As we have already noted, it does not matter that certain of these findings were initially drafted by counsel for AT & T. What is important is that the District Judge adopted these findings as his own, that they have a basis in the record, and that there is nothing to suggest that they are clearly erroneous.

trict judge "figuratively speaking, stepped down from the bench to assume the role of advocate for the plaintiff"). In none of these four cases was the decision of the court of appeals founded solely on the district judge's expressions of policy views and speculation that the district judge impermissibly based his decision on those views rather than on the applicable law.

## D. *Summary*

We recognize the difficulty of proving that a trial judge not only held certain views about law or policy, but also approached a case with an "irrevocably closed" mind or actually substituted his personal views for controlling law in deciding a case. As we have indicated, there is a strong presumption against disqualifying a judge solely on the basis of his views about law or policy. Indeed, we assume that most judges do have personal views; but we also presume that these views do not invariably cause a judge to prejudge a case or to abandon his public responsibility to preside over a fair and wholly impartial adjudication. In other words, we expect that most judges are faithful to their enormous public trust.

In the present case, however, the issue of bias has been seriously raised in a context that we find troubling. We therefore have examined the trial judge's conduct in considerable detail. We find the plaintiffs' charges of bias to be unsupported by the factors SPCC cites, whether considered individually or together as a whole. Accordingly, we reject these charges and deny SPCC's requests that we reverse and remand for bias or that we abandon the "clearly erroneous" standard of review of the District Court's factfinding.

## III. THE ANTITRUST ISSUES

## A. *Introduction*

Turning now to the substantive issues that formed the subject of the trial, we note that the District Court outlined four elements of proof that SPCC had to satisfy in order to prevail on its antitrust claims: (1) that the defendant possesses monopoly power in a relevant market; (2) that the defendant has unlawfully exercised that power to attain, or maintain, a monopoly in the relevant market; (3) that the plaintiff has suffered injury in fact as a result of those unlawful acts; and (4) that damages in a reasonably ascertainable amount have been proved.

Mem.Op. at 870 (citations omitted). The District Court then concluded in a series of alternative holdings that SPCC had failed to satisfy *any* of these elements of proof. Finally, in the "Conclusion" section of its Memorandum Opinion, the District Court held that, in any event, all of AT & T's rates and practices challenged by SPCC were immune from antitrust scrutiny because they were subject to a pervasive scheme of public utility or common carrier regulation. Thus, the District Court's judgment for AT & T rests on five principal alternative holdings.

## B. *The "Clearly Erroneous" Standard of Review*

■ On appeal, SPCC raises two general arguments on the merits. First, SPCC argues that "[o]n each and every issue on this appeal, SPCC presented evidence sufficient to prevail before an impartial decisionmaker." Appellants' Reply Brief at 5. Thus, SPCC essentially seeks to relitigate its charges against AT & T. SPCC repeats the allegations that it unsuccessfully made to the District Court, cites to evidence in the record that supports these allegations, and urges the Court of Appeals independently to review the evidence. These arguments assume that we have adopted SPCC's suggestion that we abandon the "clearly erroneous" standard on the ground that the trial court's factfinding was tainted by the District Judge's policy bias.[17] As discussed above in Part II, how-

---

**17.** The closest SPCC comes to arguing that the District Court's findings of fact should be set aside under the "clearly erroneous" standard is the following:

ever, we reject SPCC's charge of judicial bias. Accordingly, we are bound by the rule that findings of fact in actions tried without a jury "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." FED.R.CIV.P. 52(a). The Supreme Court has stated that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Thus, under the "clearly erroneous" standard, our review of findings of fact is critically limited. This point was aptly emphasized in *Krasnov v. Dinan*, 465 F.2d 1298 (3d Cir.1972), as follows:

"In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i.e., whether we are 'left with a definite and firm conviction that a mistake has been committed.'" *Speyer, Inc. v. Humble Oil and Refining Co.*, 403 F.2d 766, 770 (3d Cir.1968). It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of these factors, it may not alter the facts found by the trial court. To hold otherwise would be to permit a substitution by the reviewing court of its finding for that of the trial court, and there is no existing

authority for this in the federal judicial system, either by American common law tradition or by rule and statute. *Id.* at 1302–03. We fully subscribe to this position and adhere to it in our review of the record in this case.

The District Court's lengthy Memorandum Opinion contains extremely detailed discussions of the evidence. On each factual issue, the District Court fully discusses the evidence introduced by SPCC as well as the evidence introduced by AT & T, and explains exactly why it finds AT & T's evidence persuasive and SPCC's unconvincing. In each instance where SPCC disagrees with the District Court's findings of fact, we have reviewed the evidence discussed by the District Court as well as the evidence cited by SPCC. In a number of these instances, we acknowledge that a factfinder rationally could resolve the conflicting evidence in a manner contrary to the determination of the District Court. In every instance, however, there is clearly substantial evidence to support the findings of the District Judge; and in no instance have we been left with the definite and firm conviction that a mistake in factfinding has been committed by the trial court.

Because of the nature of this case, we have been tempted to recite in detail every factual issue raised by appellants, including an explicit description of the relevant evidence in the record and an explanation of how that evidence as a whole supports the District Court's findings. We have decided, however, that this would both involve us in a task that is wholly unnecessary to our legitimate appellate function and result in a pointless exercise. For us to detail every factual issue would be essentially to repeat scores of pages of the District Court's comprehensive Memorandum Opinion. We are aware, however, that by merely stating our conclusions

Under the proposed standard of review, it is unnecessary for this Court to even reach the question of how the district court's opinion would be reviewed under a clearly erroneous test. However, even if such a test were ap-

plied, we do not concede, as AT & T alleges (AT & T Br., p. 23), that any or all of the district court's factfindings should be affirmed.
Appellants' Reply Brief at 4 n. 4.

without engaging in such detailed discussions, we leave ourselves open to the charge that we have failed to consider the evidence. We therefore wish to emphasize that we have considered the evidence in the record relating to each and every factual issue raised by SPCC.[18] Indeed, it is only because of the need to engage in this time-consuming effort that it has taken us such a long time—over three months—to arrive at our decision and to release our opinion in this case.

Because we conclude that the District Court's findings are supported by the evidence and are not clearly erroneous, we focus our attention on SPCC's second general argument: that each of the District Court's alternative holdings is based on fundamental errors of law. We agree with SPCC's argument that the District Court's holding on the issue of implied antitrust immunity is incorrect as a matter of law. We also agree that the court's holding that AT & T lacked monopoly power is based on erroneous legal analysis. We conclude, however, that the District Court's alternative holding that AT & T did not "unlawfully exercise[ ] that power to attain, or maintain, a monopoly in the relevant market" must be sustained. In particular, we conclude that, given the District Court's findings of fact, SPCC has failed to prove that AT & T engaged in predatory pricing even under the legal test proposed by SPCC. We further conclude that the District Court in fact applied the correct legal test to evaluate SPCC's charges that AT & T engaged in exclusionary inter-connection practices. We therefore affirm the judgment of the District Court solely on the ground that SPCC failed to satisfy this second element of proof, *i.e.*, maintenance of monopoly power by exclusionary conduct.[19] Given this disposition of the case, it is unnecessary for us to consider SPCC's legal and factual arguments on the issues of injury-in-fact and proof of damages.

## C. *Implied Antitrust Immunity*

■ The District Court concluded that AT & T enjoys implied antitrust immunity, at least with regard to the pricing and interconnection practices at issue in this case, on the ground that these practices are subject to pervasive regulatory control under a public interest standard different from and inconsistent with the application of the antitrust laws. *See* Mem.Op. at 1095–97. We reject this conclusion.

The Supreme Court has repeatedly noted that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973) (quoting *United States v. Philadelphia National Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963)). The decision of the District Court in the present case notwithstanding, it is well settled that such repugnancy does not exist between the antitrust laws and the regulatory scheme applicable to AT & T's pricing and interconnection decisions. *See, e.g., MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1101–05 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Phonetele, Inc. v. AT & T,* 664 F.2d 716, 726–37 (9th Cir.1981), *cert. denied,* 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); *Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 82–84 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *Mid-Texas Communi-*

---

18. However, because we do not reach the issues of injury-in-fact and proof of damages, we have not considered the factual disputes pertaining to these issues. ·

19. "Exclusionary" conduct may be defined as "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appear capa-

ble of making a significant contribution to creating or maintaining monopoly power." 3 P. AREEDA & D. TURNER, ANTITRUST LAW ¶ 626, at 83 (1978). The issue is whether the defendant's conduct is reasonable in light of its business needs, or whether it unreasonably excludes competition. *See Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983).

*cations Systems v. AT & T,* 615 F.2d 1372, 1377–82 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Sound, Inc. v. AT & T,* 631 F.2d 1324, 1327–31 (8th Cir.1980); *Essential Communications Systems v. AT & T,* 610 F.2d 1114, 1115-25 (3d Cir.1979); *United States v. AT & T,* 461 F.Supp. 1314, 1320–30 (D.D.C.1978). We agree with the consistent analysis presented in these cases, and see no point in repeating it yet another time. We merely emphasize that, under the applicable regulatory scheme, the initial decision to file a tariff establishing rates or to provide interconnections to a competing specialized common carrier rests with AT & T, and AT & T's tariffs and interconnection decisions often become effective without FCC scrutiny or approval. At minimum, long regulatory delays often have preceded final FCC approval or disapproval of AT & T's allegedly predatory rates,[20] refusals to interconnect, or unreasonable and discriminatory terms and conditions of access to local distribution facilities. As Judge Greene concluded in *United States v. AT & T,* "it would be a gross misconception of the realities to equate the instant statutory scheme, the relatively weak regulatory controls which have implemented that scheme, and defendants' alleged activities which offend both the antitrust laws and the regulatory purposes, with the kind of explicit regulation endorsing industry conduct which the Supreme Court has held in relatively few instances to be inconsistent with antitrust enforcement." 461 F.Supp. at 1328.[21]

### D. *Monopoly Power*

 The offense of monopolization under section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Monopoly power is "the power to control prices or exclude competition." *Id.* at 571, 86 S.Ct. at 1704 (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956)). In cases involving unregulated industries, courts frequently approach the problem of measuring market power by defining the relevant product and geographic market and computing the defendant's market share. Monopoly power is then ordinarily inferred from a predominant share of the market. *See id.* Reliance on statistical market share is a questionable approach in cases involving regulated industries, however. A predominant market share may merely be the result of regulation, and regulatory control may preclude the exercise of monopoly power. Therefore, in such cases market share should be at most a point of departure in determining whether monopoly power exists. Ultimately, a court should focus directly upon the ability of the regulated firm to control prices or exclude competition. *See MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1106–07 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards,* 22 Antitrust Bull. 559, 565–68 (1977).

---

**20.** *See* note 5 *supra.*

**21.** Notwithstanding the District Court's holding on the issue of implied antitrust immunity, the court clearly recognized the inadequacy of the regulatory scheme, as implemented by the FCC, to prevent anticompetitive behavior. Thus, the District Court noted that "every action complained of in this case could have or should have been handled by the appropriate regulatory bodies, *which responsibility the regulators miserably mishandled or failed to handle."*

Mem.Op. at 1096 (footnote omitted) (emphasis added). The District Court further noted that "[i]t was the FCC that never found TEL–PAK (C & D) unlawful for over *20* years, as well as delayed making other very important decisions," and that "[h]ad the FCC not engaged in its usual regulatory lag and dealt forthrightly and properly with the problems as they arose, then few, if any, of the cases would now be before the antitrust Courts, such as this one." *Id.* at 1097 (emphasis in original).

The District Court's analysis of monopoly power in the present case is consistent with the above principles. The District Court defined the relevant market as "the interstate, intercity private line market (excluding sole source governmental telecommunications needs and short haul) in the geographic areas which plaintiffs elected to serve, or would have served in their 'but for' world." [22] Mem.Op. at 1097; *see id.* at 871–77. The District Court then determined that AT & T's market share ranged from a high of 95.6% to a low of 66.5%, sufficient to support an inference of monopoly power. *Id.* at 878. Nevertheless, the District Court concluded that this inference was rebutted by AT & T's inability in fact to control prices or exclude competition. In particular, the District Court rejected SPCC's argument that AT & T had monopoly power by virtue of various barriers to market entry, such as costs and delays inherent in the regulatory process, substantial capital outlays and lengthy construction programs needed to build intercity telecommunications systems, brand loyalty enjoyed by AT & T, and AT & T's control of interconnection with its local distribution facilities. *See id.* at 880–84. The District Court noted that entry actually had occurred at a rapid pace. *See id.* at 884–85.[23] Finally, the District Court concluded that the complete control over prices and access to local distribution facilities exercised by the FCC and the state regulatory agencies precluded AT & T from exercising monopoly power. *See id.* at 885–88.

▮▮▮ SPCC argues on appeal that the District Court's conclusions on the issues of barriers to entry and regulatory control were based on erroneous legal analysis, and that the court's overall conclusion that AT & T lacked monopoly power therefore must be set aside. We agree. In concluding that the regulatory agencies prevented AT & T from controlling price or excluding competition, the District Court erred, as it had in its analysis of implied antitrust immunity, in failing to consider the realities of the regulatory scheme. That scheme leaves pricing and interconnection decisions to AT & T in the first instance. The regulatory agencies are not always able to respond to alleged abuses immediately and effectively.

▮▮▮ The District Court also erred in ruling that costs and delays imposed by the regulatory process are not barriers to entry. The District Court based this ruling on the ground that the regulatory agencies, and not AT & T, are responsible for these costs and delays. The defendant's innocence or blameworthiness, however, has absolutely nothing to do with whether a condition constitutes a barrier to entry. Any market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm should be considered a barrier to entry, regardless of who is responsible for the existence of that condition. Thus, the costs and delays of the regulatory process clearly constitute barriers to entry. On this point, Judge Greene noted in *United States v. AT & T,* 524 F.Supp. 1336 (D.D.C.1981), that

a persuasive showing has been made that [AT & T has] monopoly power (wholly apart from FCC orders with respect to interconnection) through various barriers to entry, such as the creation of bottlenecks, entrenched customer preferences, the regulatory process, large capital requirements, access to technical information, and disparities in risk. These factors, in combination with the evidence of market shares, suffice at least to meet the government's initial burden, and the burden is then appropriately placed upon

22. SPCC argues that the relevant market should be defined as the nationwide market for all business and government intercity telecommunications services. Mem.Op. at 871; *see* Appellants' Opening Brief at 27 n. 23. Given our disposition of this case, we need not decide this issue.

23. SPCC argues that this finding is overstated. *See* Appellants' Opening Brief at 27; Appellants' Reply Brief at 19–20.

defendants to rebut the existence and significance of barriers to entry. On that basis, the defendants' regulatory defense to the government's claim of monopoly power must and will be rejected. *Id.* at 1347–48 (footnotes omitted); *see also* G. BROCK, THE TELECOMMUNICATIONS INDUSTRY 198, 213–15 (1981).

■ Similarly, as noted by Judge Greene, the need for large capital outlays and lengthy construction programs in order to enter the market, and the need to overcome brand preference established by the defendant's having been first in the market or having made extensive "image" advertising expenditures, also constitute barriers to entry. *United States v. AT & T,* 524 F.Supp. at 1348; *see also Transamerica Computer Co. v. IBM,* 481 F.Supp. 965, 976 (N.D.Cal.1979), *aff'd,* 698 F.2d 1377 (9th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *see also* 2 P. AREEDA & D. TURNER, ANTITRUST LAW ¶¶ 409d–409e (1978); Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 YALE L.J. 213, 228–29 (1979).

■ Finally, and perhaps most critically, AT & T's control of interconnection with its local distribution facilities constitutes a barrier to entry. *See* 2 P. AREEDA & D. TURNER, ANTITRUST LAW ¶ 409f (1978); G. BROCK, THE TELECOMMUNICATIONS INDUSTRY 198–99, 216–18 (1981). The District Court erroneously dismissed this factor on the ground that the FCC has power to mandate interconnection pursuant to 47 U.S.C. § 201(a) (1976), again ignoring the realities of control by AT & T in the first instance

and of regulatory delay and inefficiency in policing alleged abuses.

It is not clear to us whether the District Court still would have found that AT & T lacked monopoly power had it properly considered the effect of regulatory control and barriers to entry. Accordingly, if the issue of monopoly power were dispositive, we would have to remand the case to the District Court. The court went on, however, to hold in the alternative that AT & T did not use its power over price and entry in an exclusionary manner. Because we conclude that this holding is supported even under the legal standards proposed by SPCC, we affirm the judgment of the District Court dismissing SPCC's monopolization action.

E. *"Willful Acquisition or Maintenance" of Monopoly Power*

As noted in Part III.D above, the second element of the offense of monopolization is the "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). SPCC argues that AT & T willfully maintained its monopoly power by engaging in predatory pricing and exclusionary interconnection practices.

1. *The Predatory Pricing Charges*

SPCC alleges that AT & T willfully maintained monopoly power through predatory pricing of the Telpak,[24] Hi/Lo and MPL tariffs.[25] AT & T used each of these tar-

---

**24.** SPCC also argues that the structure of Telpak was anticompetitive even if Telpak was not preditorily priced. The District Court rejected SPCC's arguments after full consideration. *See* Mem.Op. at 947–53; *accord MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1130–31 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). We agree with the District Court's analysis. We note that the Telpak structure was designed for legitimate business reasons to duplicate the economic characteristics of the private microwave systems that large users of AT & T's private line services

considered constructing for their own use following the FCC's *Above 890* decision. The District Court found after fully reviewing the evidence that AT & T continued to maintain and market Telpak throughout the 1960's and 1970's as a competitive alternative to private microwave. *See* Mem.Op. at 953–55. This finding is supported by the evidence and is not clearly erroneous.

**25.** For a brief description of these tariffs, see note 5 *supra.*

iffs to reduce prices in response to competition. Following the FCC's *Above 890* decision, AT & T faced competition in the market for bulk private line services from the users of these services, who were permitted to construct private microwave systems for their own use. AT & T responded by offering a greatly reduced bulk rate under the Telpak tariff. Similarly, following the *MCI* and *Specialized Common Carriers* decisions, AT & T faced competition from the specialized common carriers in the market for single channel private line services along low cost, high density routes. AT & T responded by reducing prices for these services first under the Hi/Lo tariff and later under the MPL tariff.

Ordinarily, price cuts are a necessary and desirable response to competition. Courts and commentators have recognized, however, that there may be circumstances in which price cuts serve an anticompetitive purpose. In particular, there is concern that a firm might deliberately sacrifice present revenues for the purpose of driving rivals out of the market and then recoup the losses through higher profits earned in the absence of competition.[26] The problem of differentiating between lawful price cuts and predatory price cuts presents considerable theoretical and practical difficulties, and has been the subject of a heated debate among scholars of antitrust law.[27] In particular, courts and commentators have disagreed about whether the test should be based purely on the relationship between the firm's prices and costs, or whether evidence of subjective intent also should be considered. In addition, there is disagreement about which measures of cost are theoretically and practically appropriate.

In the present case, SPCC raises a barrage of objections to the District Court's analysis of the predatory pricing issue. According to SPCC, the District Court made incorrect findings of fact concerning AT & T's costs, misconstrued the significance of the measures of cost used, and applied an incorrect legal test. In order to provide a framework for discussing the District Court's analysis and the contentions of the parties, we shall consider first the issue of the proper legal test to apply. SPCC alleges that the District Court improperly adopted the Areeda-Turner test,[28] and urges us essentially to adopt the Ninth Circuit's *Inglis-Transamerica* test.[29]

---

**26.** *See, e.g., Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 231 (1st Cir.1983); *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1112 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 86 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 HARV.L.REV. 697, 698 (1975).

Some commentators have argued that this type of conduct is irrational and unlikely to occur in the case of an unregulated firm. *See, e.g.,* R. BORK, THE ANTITRUST PARADOX 144–60 (1978); Easterbrook, *Predatory Strategies and Counter-strategies,* 48 U.CHI.L.REV. 263 (1981); McGee, *Predatory Pricing Revisited,* 23 J. LAW & ECON. 289 (1980). A different argument leading to the same conclusion can be made in the case of a firm subject to overall rate-of-return regulation. *See, e.g.,* Testimony of Kenneth J. Arrow, *United States v. AT & T,* Civ. Action No. 74–1698 (D.D.C.), at 35–37.

**27.** The seminal and most influential article has been Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sher-*

*man Act,* 88 HARV.L.REV. 697 (1975). For other prominent views, see, *e.g.,* R. BORK, THE ANTITRUST PARADOX 144–60 (1978); R. POSNER, ANTITRUST LAW: AN ECONOMIC PERSPECTIVE 184–96 (1976); Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 YALE L.J. 1 (1979); Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 YALE L.J. 213 (1979); Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 HARV.L.REV. 869 (1977); Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 YALE L.J. 284 (1977).

**28.** *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 HARV.L.REV. 697 (1975); *see also* 3 P. AREEDA & D. TURNER, ANTITRUST LAW ¶¶ 711–721 (1978 & Supp.1982).

**29.** *See Transamerica Computer Co. v. IBM,* 698 F.2d 1377 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982).

The Areeda-Turner test establishes conclusive presumptions that prices are either lawful or predatory depending solely on the relationship between those prices and certain measures of the firm's costs. According to Professors Areeda and Turner, a price at or above average total cost [30] should be conclusively presumed lawful. This should be so even if the price is not profit-maximizing in the short run and even if the price was set in order to preserve or enhance market share by deterring rivals. The rationale for this rule is that when a firm prices at or above average total cost, its total revenues cover its total costs, including a normal return on investment. Such pricing can drive out only less efficient rivals; that is, rivals who are unable to produce equivalent goods or services at as low a cost as the monopolist. Such competition based on superior performance must, according to Areeda and Turner, be considered competition on the merits.

Professors Areeda and Turner further argued that a price at or above reasonably anticipated short run marginal cost [31] also should be conclusively presumed lawful.[32] Areeda and Turner acknowledged that such pricing could drive out equally or more efficient rivals who have less staying power than the monopolist, and therefore possibly might not maximize long run consumer welfare. Nevertheless, Areeda and Turner concluded that allowing pricing as low as marginal cost is desirable because it produces the competitive and socially optimal result in the short run. Finally, Areeda and Turner recognized that marginal cost cannot readily be inferred from conventional business accounts, and therefore proposed that average variable cost [33] be used as a proxy for marginal cost.

The Ninth Circuit has rejected the idea that courts should distinguish lawful from predatory pricing solely on the basis of the relationship between the firm's prices and costs. Instead, under the Ninth Circuit's test, "to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1035 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). The Ninth Circuit has, however, adopted a cost-based test for the purpose of allocating the burden of proof. Thus, according to the Ninth Circuit, if the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors. *Id.* at 1036. If the plaintiff proves that the defendant's prices were below average total cost but not below average variable cost, the plaintiff bears the burden of proving by a preponderance of the evidence that the defendant's pricing was predatory in the sense that "the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." *Id.* at 1035–36. Finally, if the plaintiff cannot prove that the defendant's prices were below average total cost, the plaintiff must prove by clear and

---

**30.** Average total cost is the sum of fixed cost and total variable cost, divided by output. Fixed cost is the sum of all costs that do not vary with output; total variable cost is the sum of all costs that vary with changes in output. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 HARV.L.REV. 697, 700 (1975).

**31.** Marginal cost is the increment to total cost that results from producing an additional increment of output. *Id.*

**32.** Under the Areeda-Turner test, a price below reasonably anticipated short run marginal cost (or its proxy, average variable cost) is conclusively presumed predatory, unless at or above average total cost. *Id.* at 733.

**33.** Average variable cost is the sum of all variable costs divided by output. Variable costs are costs that vary with changes in output. *Id.* at 700.

convincing evidence—*i.e.*, that it is highly probably true—that the defendant's pricing policy was predatory in the above sense. *Transamerica Computer Co. v. IBM*, 698 F.2d 1377, 1388 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

Application of the above tests is complicated in the present case because AT & T is a multiservice firm. The measures of cost it uses for its private line services are "long run incremental cost" ("LRIC") and "fully distributed cost" ("FDC") rather than average variable cost or average total cost. The District Court did not precisely define these measures of cost. The court noted that "[l]ong run incremental costs or average incremental costs are a form of marginal costs reflecting the change in total costs caused by changes in output over a longer period of time." Mem.Op. at 922 (citations to record omitted).[34] The court described FDC as follows:

> Fully distributed cost is an accounting concept focusing on the historical costs reflected in the books of the company. Fully distributed costs require an allocation of the firm's total costs to the firm's various product lines. [T]he allocation methods used to compute fully distributed cost are inherently arbitrary and have no economic basis.

Mem.Op. at 922 n. 105 (citations to record omitted).

With this background, we are ready to turn to consideration of the District Court's analysis of SPCC's predatory pricing charges and to SPCC's objections to that analysis. First, the District Court held that a cost-based standard must be adopted to judge SPCC's predatory pricing claims. Next, the court concluded that "marginal or incremental cost" is the appropriate cost to consider. The court then found that

SPCC failed to prove that Telpak, Hi/Lo or MPL were priced below incremental cost. Accordingly, the court held that SPCC failed to prove that AT & T had engaged in predatory pricing. Although the court rejected FDC as an appropriate measure of cost for identifying predatory pricing, the court nevertheless made findings that Telpak, Hi/Lo and MPL were priced above FDC as well as above LRIC. *See* Mem.Op. at 918–33.

In conducting the above analysis, the District Court purported to adopt the Areeda-Turner test. The court did not, however, as SPCC alleges, rely on the somewhat controversial Areeda-Turner rule that a price at or above reasonably anticipated short run marginal cost (or its proxy, average variable cost) is conclusively presumed lawful. When the court stated that "marginal or incremental cost" is the appropriate cost to consider, it was referring to long run incremental cost. The court noted that "[l]ong run or average incremental costs ... include certain items of long term expense that are typically considered fixed and would generally be excluded from a calculation of average variable cost, such as the cost of plant and equipment, as well as the cost of capital. It is generally recognized that long run or average incremental cost approximates anticipated average total cost for various levels of production." Mem.Op. at 922 (footnote and citations omitted). Thus, the court adopted only the relatively uncontroversial Areeda-Turner rule that a price at or above average total cost is conclusively presumed lawful.

SPCC argues on appeal that the District Court made errors of both fact and law. First, SPCC argues that the District Court erred in finding that Telpak, Hi/Lo and MPL were priced above LRIC and FDC. Second, SPCC argues that the District

---

**34.** The court cited an article by Professor Baumol that defines "average incremental cost" as follows:

> [T]he average incremental cost of product X is defined as total company cost minus what the total cost of the company would be in the absence of production of X, all divided by the quantity of X being produced. Total costs

refer to those that would prevail in the long-run with the output combinations specified. Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing*, 89 YALE L.J. 1, 9 n. 26 (1979); *see also* Joskow & Klevorick, A *Framework for Analyzing Predatory Pricing Policy*, 89 YALE L.J. 213, 252 n. 79 (1979).

Court erred in rejecting FDC as an appropriate measure of cost. According to SPCC, LRIC, at least as used by AT & T, corresponds to average variable cost, and FDC corresponds to average total cost. Third, SPCC argues that the District Court erred in adopting the Areeda-Turner test rather than the *Inglis-Transamerica* test. In sum, SPCC argues that the District Court should have ruled in its favor on its predatory pricing charges on the basis of *each* of the three alternative grounds provided by the *Inglis-Transamerica* test: (1) SPCC proved that AT & T priced below average variable cost (which SPCC equates with LRIC); (2) SPCC proved that AT & T priced below average total cost (which SPCC equates with FDC) with predatory intent; and (3) even if SPCC did not prove that AT & T priced below average total cost, SPCC proved by clear and convincing evidence that AT & T priced with predatory intent.

In response to these arguments, we must note that we have serious doubts about the usefulness of FDC as a measure of cost to be used in distinguishing lawful from predatory pricing.[35] We also have serious doubts about the correctness of SPCC's characterization of LRIC and FDC in terms of average variable cost and average total cost.[36] Given the District Court's findings of fact in the present case, however, it is unnecessary for us to resolve these issues. It is also unnecessary for us to decide today precisely what rule for identifying predatory pricing this circuit should adopt. We hold only that, accepting *arguendo* SPCC's legal arguments, SPCC cannot on the facts of this case prevail on *any* of the three grounds it advances.

 First, we conclude that the District Court's findings that AT & T priced Telpak, Hi/Lo and MPL above both LRIC and FDC are not clearly erroneous. The evidence supporting these findings is discussed at considerable length in the District Court's opinion. Briefly, AT & T submitted a number of cost studies showing that the Telpak, Hi/Lo and MPL rates were projected to be above LRIC and FDC, and actually were above those costs. AT & T's studies were corroborated by a study performed by an independent accounting firm. A number of economists testified that AT & T's cost studies were as soundly conceived and carried out as such studies practicably can be. In contrast, SPCC did not introduce a single study purporting to show AT & T's actual costs. SPCC introduced several internal AT & T documents allegedly showing that Telpak was not profitable. The District Court found these documents inconclusive:

> For the most part, the Court cannot tell what kind of analysis underlies these documents or what they were intended to reflect; and for this reason alone, the Court cannot give this evidence any significant weight. It appears, however, that several of the documents do not even relate to Telpak's revenue/cost relationship and that several others in fact show that [sic] Telpak rates to be covering costs. Moreover, other of the documents do not appear to reflect current conditions at all, but rather to show rough projections into 1977 and 1980 which were associated with some kind of rate planning effort (*e.g.*, PX2–0168; PX2–0175). But by 1977, AT & T had filed to terminate Telpak, thus rendering these projections of little significance. On balance, the Court cannot find that these unexplained documents are sufficient to meet plaintiffs' burden of proof,

**35.** *See MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1114–25 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 89–90 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *cf. Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221, 1236–47 (D.C.Cir.1980) (Wilkey, J., dissenting) (arguing that it was arbitrary and capricious for the FCC to prescribe fully distrib-

uted cost as a standard for establishing minimum rates in competitive markets), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 311 (1981).

**36.** *See MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1114–25 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

particularly when compared to AT & T's detailed, formal studies.

Mem.Op. at 929–30 (footnotes omitted). SPCC also introduced the testimony of two cost witnesses, Mr. Tucker and Mr. Scott, who took AT & T's own cost studies, adjusted them for alleged errors in data and methodology, and then recalculated the cost figures. The recalculated figures showed that Hi/Lo and MPL were priced below LRIC and FDC. SPCC concedes, however, that "Messrs. Scott and Tucker did not purport to establish the true FDC and LRIC for Hi/Lo and MPL." Appellants' Opening Brief at 86. In any case, the District Court found that Mr. Tucker and Mr. Scott were not knowledgeable about AT & T's actual plant, engineering, or costs; that there were unexplained inconsistencies in their studies; and that AT & T's witnesses effectively responded to Mr. Tucker's and Mr. Scott's criticisms and demonstrated that their calculations seriously overstated AT & T's costs. Finally, SPCC relied on the testimony of its principal cost witness, Dr. Melody. The District Court found that Dr. Melody's testimony was refuted by AT & T's witnesses. We have reviewed the evidence and testimony summarized above and conclude that the District Court's findings that Telpak, Hi/Lo and MPL were priced above LRIC and FDC are supported by the evidence and are not clearly erroneous.

 Having established that the District Court's findings concerning AT & T's costs are not clearly erroneous, we now turn to SPCC's argument that it has proved predatory pricing under the *Inglis-Transamerica* test. SPCC concedes that FDC is equivalent to average total cost. Thus, even under SPCC's view, the District Court's findings that Telpak, Hi/Lo and MPL were priced above FDC mean that

Telpak, Hi/Lo and MPL were priced above average total cost. In order to prevail under the *Inglis-Transamerica* test that it advocates, therefore, SPCC must present clear and convincing proof that AT & T priced with predatory intent; that is, that "the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." *Inglis*, 668 F.2d at 1035. SPCC argues that it met this requirement by proving that AT & T priced below its short run profit-maximizing level in order to eliminate competition from the specialized common carriers.[37] The District Court considered SPCC's charge that AT & T priced below the profit-maximizing rate and found that the charge was unsupported. *See* Mem.Op. at 964–65. The District Court also considered SPCC's "intent" documents and found that these documents could not be read as evincing an anticompetitive intent within the meaning of *Inglis*. *See id.* at 890–912, 922 n. 106. We have reviewed the record and conclude that these findings are supported by the evidence and are not clearly erroneous. Accordingly, even assuming *arguendo* that the *Inglis-Transamerica* test advocated by SPCC is the appropriate test to use, we conclude that SPCC has failed to prove that AT & T engaged in predatory pricing.[38]

2. *The Interconnection Charges*

SPCC alleged at trial that AT & T unlawfully maintained its monopoly power by engaging in various exclusionary interconnection practices. SPCC's theory was that AT & T was required to provide SPCC with full and nondiscriminatory access to the Bell operating companies' local distribution facilities under the "essential facilities" doctrine of the antitrust laws. AT & T

37. We note that the First Circuit recently rejected the *Transamerica* rule after thoughtful consideration and held that prices above both marginal and average total cost, even if not profit-maximizing, are conclusively presumed lawful. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 233–36 (1st Cir.1983); *accord MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1114 (7th Cir.) (decided before *Transamerica*),

*cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

38. And, *a fortiori*, as the District Court concluded, SPCC has failed to prove that AT & T engaged in predatory pricing under the Areeda-Turner test.

argued in defense that, to the extent that it had engaged at all in the alleged interconnection practices, its conduct was justified by its duty under the regulatory scheme to interconnect only when such interconnection is in the public interest. The District Court ruled in favor of AT & T on each of SPCC's interconnection charges. *See* Mem.Op. at 972–1054. SPCC's principal argument on appeal is that the District Court applied a legally incorrect standard for upholding AT & T's assertions of what SPCC terms the "regulatory justification defense." SPCC also contends that the District Court made errors in its factfinding.[39]

On appeal, SPCC focuses on five practices or courses of conduct in which AT & T allegedly engaged. Briefly, SPCC's allegations, each of which was rejected by the District Court, are as follows. First, according to SPCC, AT & T engaged in a course of conduct prior to SPCC's commencement of operations on December 26, 1973, that was intended to delay SPCC's entry into the market. SPCC sets forth the following scenario to support its first charge: Before SPCC could commence operations, it was necessary for AT & T and SPCC to establish the terms and conditions upon which AT & T would provide SPCC with interconnections to the Bell operating companies' local distribution facilities. In order to delay having to provide these interconnections, AT & T negotiated in bad faith with SPCC over the terms of a draft facilities contract. When these negotiations were nearing completion, AT & T unilaterally and in bad faith decided to provide the interconnections pursuant to facilities tariffs rather than pursuant to contract. Moreover, AT & T decided to file its tariffs with the state regulatory commissions rather than with the FCC. In October 1973, however, the FCC learned of this plan and ordered the tariffs to be filed with the FCC.

Second, according to SPCC, AT & T refused to provide SPCC with interconnections that would enable SPCC to provide certain switched services, known as FX and CCSA services.[40] It is contended that AT & T based its refusal in bad faith on the pretext that the *Specialized Common Carriers* decision did not authorize SPCC to provide these services, and that it would be contrary to the public interest for AT & T voluntarily to provide interconnections with its switched network, since such interconnections would have an adverse economic, technical and operational impact on the Bell system. On April 23, 1974, however, the FCC ruled that the *Specialized Common Carriers* decision had authorized the specialized common carriers to provide FX and CCSA services.

Third, according to SPCC, AT & T reclassified certain interstate circuits as intrastate circuits in order to deny SPCC interconnections and to place SPCC at a competitive disadvantage.

Fourth, SPCC claims that AT & T provided SPCC with interconnections and services that were operationally and technically inferior to those provided to AT & T's own Long Lines Department.

Finally, according to SPCC, AT & T charged SPCC discriminatorily and excessively high prices for interconnections.

Each of the above charges is based on the theory that the Bell operating companies' local distribution facilities are "essential facilities." By using its control over access to these essential facilities, AT & T had the ability to extend its natural monopoly power in the market for local public switched telephone service to the competitive market for intercity private line service. The antitrust laws therefore prohibit AT & T from unreasonably and discriminatorily restricting access to these essential facilities. *See Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992–93 (D.C.Cir.1977), *cert.*

---

**39.** We have considered each of these factual contentions, and upon review of the record conclude that the District Court's findings of fact relating to SPCC's interconnection charges are supported by the evidence and are not clearly erroneous.

**40.** For a brief description of FX and CCSA services, see note 5 *supra*.

*denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *see also Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *United States v. AT & T,* 524 F.Supp. 1336, 1352–53 (D.D.C. 1981).

■ Absolute equality of access to essential facilities, however, is not mandated by the antitrust laws. In *United States v. Terminal Railroad Association,* the Supreme Court required that access to essential facilities be afforded to competitors "upon such just and reasonable terms and regulations as will, in respect of use, character and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies." 224 U.S. at 411, 32 S.Ct. at 516. Similarly, in *Hecht,* this circuit stated that essential facilities must be shared on "fair terms," and noted that "[t]he antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately." 570 F.2d at 992–93; *see also United States v. AT & T,* 524 F.Supp. at 1360–61 ("problems of feasibility and practicability may be taken into account by the Court in determining the sufficiency under the law of the access to essential facilities granted by defendants to non-Bell carriers").

■ Denials of access or restrictive interconnection practices also possibly may be justified on the basis of AT & T's duties as an enterprise regulated under a "public interest" standard. AT & T's duty to provide interconnections with other carriers is governed by section 201(a) of the Communications Act, which provides:

It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

47 U.S.C. § 201(a) (1976). When AT & T is presented with an interconnection request, it must decide in the first instance whether or not voluntarily to grant the request. Public policy will be vindicated only if AT & T makes this decision on the basis of the "public interest" standard of section 201(a) as it has been interpreted by the FCC. *See Mid-Texas Communications Systems v. AT & T,* 615 F.2d 1372, 1389 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). It would therefore be contrary to public policy to permit antitrust liability against AT & T on the basis of interconnection decisions so made. *See id.*

■ In our view, and in the view of other circuits that have considered the issue, this regulatory justification defense is only applicable if AT & T's asserted "public interest" basis for its interconnection decision is reasonable and if AT & T actually made its decision at the time in good faith on that basis rather than solely on the basis of competitive considerations. The "reasonableness" component of this test requires that AT & T have a reasonable basis in terms of concerns for the public interest that are concrete, articulable, and recognized as legitimate by the appropriate regulatory agencies. *See, e.g., Phonetele, Inc. v. AT & T,* 664 F.2d 716, 737–38 (9th Cir.1981), *cert. denied,* 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983). As the Fifth Circuit noted in *Mid-Texas,* however, "[t]hough the refusal may be based upon articulable concerns of public policy, it may also be possible to rationalize a decision whose purpose is anticompetitive." 615 F.2d at 1380. Thus, the "good faith" com-

ponent of the test is required as well. Accordingly, the Fifth Circuit held in *Mid-Texas* that Bell could defend its denials of interconnections only "to the extent that Bell *based* its decision here on articulable concerns relating to the public interest as defined in section 201(a)." *Id.* at 1381 (emphasis added). The Fifth Circuit further stated that "[i]f Bell was correct in its assessment [that interconnection was contrary to the public interest], *and if its purpose in refusing interconnection was to vindicate the public interest*, then the refusal, despite its obvious anticompetitive effect, would have been proper and entitled to protection from antitrust scrutiny." *Id.* at 1390 (emphasis added).

In sum, we agree with the standard articulated by the Seventh Circuit, which includes both objective and subjective components:

> An ideal instruction would very briefly explain, for example, that a carrier has an obligation under the Communications Act to interconnect, but may deny interconnections if it determines that the public interest is to the contrary; and that if the carrier at the time had a reasonable basis in regulatory policy to conclude, and in good faith concluded, that denial of interconnections is required by concrete, articulable concerns for the public interest, then there is no liability under the antitrust laws.

*MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1138 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

SPCC argues that the District Court in the present case erred as a matter of law by adopting and applying a test requiring only objective reasonableness. In consequence, according to SPCC, the District Court repeatedly upheld AT & T's after-the-fact rationalizations for its refusals voluntarily to provide interconnections and for the exclusionary practices in which it allegedly engaged after the FCC ordered it to provide interconnections. SPCC argues that the District Court ignored the evidence it introduced allegedly proving that AT & T's conduct was anticompetitively motivated and that AT & T's asserted public interest concerns were pretextual.

It is true that the District Court's discussion of the applicable legal standard for SPCC's interconnection charges focused on the element of objective reasonableness. *See* Mem.Op. at 972–78. The District Court stated that "a denial of interconnection prior to an FCC determination of the public interest will be deemed reasonable under the antitrust laws if there was an objectively reasonable basis for believing that the interconnection was not in the public interest based on recognized public interest considerations." Mem.Op. at 976. It is clear, however, that the District Court recognized and required the element of subjective good faith as well. For example, the District Court approvingly discussed the Fifth Circuit's analysis in *Mid-Texas* of the regulatory justification defense, which requires both reasonableness and good faith. Indeed, the District Court noted that "the Fifth Circuit recognized that it would be 'contrary to public policy to permit antitrust liability' to be imposed where the carrier denies interconnection *on the basis* of legitimate public interest factors." Mem.Op. at 977 (emphasis added).

More to the point, the District Court conducted a thorough examination of all of SPCC's evidence that AT & T acted with anticompetitive intent, and found that AT & T acted throughout in good faith. The District Court conceded that AT & T disagreed in principle with the policy decisions of the FCC and intended to oppose those decisions by speaking out against the FCC's policies. The District Court found, however, that in spite of this disagreement, AT & T was determined to live with the *Specialized Common Carriers* decision as long as it remained official policy and to cooperate fully with the FCC, to follow the FCC's orders, and to treat SPCC and the other specialized common carriers in a fair and nondiscriminatory manner. Moreover, the District Court found that AT & T made certain that its employees and the presidents of the Bell operating companies un-

derstood AT & T's commitment to this policy of full cooperation. The District Court's discussion of this evidence and elaboration of these conclusions precede its discussion of the regulatory justification defense in the Memorandum Opinion; accordingly, there was no reason for the trial court to focus on the subjective good faith element of that defense, which it had already established had been satisfied.

Furthermore, in its subsequent discussion of SPCC's various specific interconnection charges, the District Court repeatedly reasserted its findings that AT & T acted in good faith. To take just one example, SPCC asserts that in accepting AT & T's regulatory justification for its refusal voluntarily to provide FX and CCSA interconnections, the District Court erred "[i]n accepting ... after-the-fact rationalization[s] while ignoring pervasive evidence of AT & T's bad faith." Appellants' Opening Brief at 43. Yet, in discussing AT & T's denial of FX and CCSA interconnections, the District Court noted that it had

> examined carefully a number of AT & T documents put into evidence here by SPCC which SPCC asserts show that AT & T knew that its conduct was inconsistent with the FCC's orders. The court finds, to the contrary, that none of these documents support that proposition directly or indirectly. What they do show is a general concern by Bell System employees at various levels about the potentially adverse economic, technical and operational consequences of FCC policy trends and possible future FCC directives.

Mem.Op. at 997 n. 209.

We therefore reject as unfounded SPCC's argument that the District Court erred as a matter of law by adopting and applying an incorrect legal standard to judge the sufficiency of AT & T's assertions of the regulatory justification defense.

CONCLUSION

We reject SPCC's charge that it was denied a fair trial because of the District Judge's alleged legal and policy bias. We sustain the District Court's holding that SPCC failed to prove that AT & T engaged in predatory pricing or other exclusionary conduct in violation of section 2 of the Sherman Act. Because this holding is sufficient to support the District Court's judgment in favor of AT & T, the judgment of the District Court is

*Affirmed.*