**ROGERS RADIO COMMUNICATIONS SERVICES, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

American Telephone & Telegraph Company, Illinois Bell Telephone Company, Intervenors.

**ROGERS RADIO COMMUNICATIONS SERVICES, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

Illinois Bell Telephone Company, American Telephone & Telegraph Company, Intervenors.

Nos. 83–2215, 83–2216.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1984.

Decided Jan. 4, 1985.

Philips Bowerman Patton, Washington, D.C., with whom Jeremiah Courtney, Washington, D.C., was on the brief, for appellant in No. 83–2215 and petitioner in No. 83–2216. Dennis C. Brown, Washington, D.C., also entered an appearance for Rogers Radio Communications Services, Inc.

Carl D. Lawson, Counsel, Federal Communications Commission, Washington, D.C., with whom Bruce E. Fein, General Counsel, Daniel M. Armstrong, Associate General Counsel, and Jane E. Mago, Counsel, Federal Communications Commission, Washington, D.C., were on the brief, for appellee in No. 83–2215 and respondent in No. 83–2216. Barry Grossman and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., also entered appearances for appellee, United States of America in No. 83–2216.

Alfred Winchell Whittaker, Washington, D.C., with whom Charles R. Cutler and John A. Zackrison, Washington, D.C., were on the brief for intervenor, Illinois Bell Telephone Company in Nos. 83–2215 and 83–2216.

Judith A. Maynes and Richard J. Cunningham, New York City, were on the brief for intervenor, American Telephone & Telegraph Company in Nos. 83–2215 and 83–2216.

Before MIKVA, STARR, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This appeal grew out of a dispute between Rogers Radio Communications Services ("Rogers Radio" or "Rogers"), and Illinois Bell Telephone ("IBT"), the intervenor in this lawsuit, over IBT's refusal to grant Rogers' request for access to one of IBT's telephone services. IBT and Rogers are presently competitors in the one-way paging market, a service we will describe more fully below. Notwithstanding their status as competitors, Rogers must rely upon IBT, a wireline carrier, to provide it with access to the telephone communications network through various services. In a petition to dismiss or deny IBT's application to expand its one-way paging system, Rogers charged IBT with discriminatory and anticompetitive activity in violation of § 201(a) of the Communications Act. 47 U.S.C. § 201(a) (1976). Rogers later filed a separate complaint with the Commission alleging anticompetitive and discriminatory conduct on the part of IBT and seeking an award of money damages. In both its hearing before an Administrative Law Judge and on review of that decision by the Review Board, Rogers lost on the merits of its complaint. Rogers now brings this appeal, challenging the FCC's denial of Rogers' request for review of the Review Board's decision both to deny Rogers' anticompetitive claim and to affirm the grant of IBT's expansion application.

I

The facts of this case are lengthy, inasmuch as the steps leading up to the appeal

before us span an entire decade. In summary fashion, Rogers Radio has been operating as a nonwireline radio common carrier ("RCC") in the Chicago metropolitan area for a number of years. Rogers provides, among other things, one-way paging service to its customers. One-way paging is a service commonly used by physicians and other "on-call" professionals. The subscriber to such a service is provided with a code number; that number is either relayed by telephone to a paging service operator who transmits the code via radio signal to the paging "beeper" or, alternatively, the code is punched in on a touch-tone telephone and an automatic machine at the paging service then relays a radio signal "beep" to the subscriber.

Rogers has been provided interconnection with telephone wireline service through IBT, which until January 1984 was one of the Bell operating companies. Sometime during 1972, Rogers began using automatic machine answering devices in its one-way paging system with the intention ultimately of eliminating through full automation the need to employ operators to answer incoming calls. That intention, however, was never fully realized for business reasons unrelated to this case.[1] In August 1972, IBT and Rogers entered into a contract enabling Rogers to interconnect its machines to "local" Chicago telephone lines. The local lines enabled Rogers to receive calls from customers located either in the city of Chicago or in the inner metro-

politan area ("Inner-Met"). At that time, a small number of Rogers' customers were situated in the area immediately outside the Chicago metropolitan area ("Outer-Met"). These customers had to incur long distance telephone charges in order to access Rogers' paging service. With the objective of expanding its Outer-Met customer base, Rogers sought to obtain from IBT the Inward-bound Wide Area Telephone Service (INWATS)[2] for Rogers' paging service. INWATS would enable Outer-Met customers to access Rogers' paging terminal free of any long distance charge.

In February 1974, two INWATS lines were installed at Rogers' paging terminal. The two lines were ordered from IBT for "a telecommunications service" offered by Rogers. J.A. at 514. At that time, Rogers Radio was equipped to provide three distinct types of telecommunications services. In addition to its one-way paging service, Rogers also furnished message forwarding and message relay services. There is no evidence in the record suggesting that at the time the first two INWATS lines were installed at Rogers' facility IBT was aware that those lines were to be used in connection with Rogers' one-way paging service. It was not until the spring of 1974 that Rogers explicitly requested, orally, INWATS interconnection for its machine-answered paging service.[3]

Prior to Rogers' request for INWATS interconnection to its machines, some fundamental regulatory questions had been

---

**1.** Rogers continues to employ operators to answer manually paging calls because (1) customers with rotary dial telephones must use a manual service and (2) some customers simply prefer a service involving communication through an operator. *See* J.A. at 697.

**2.** As is by now generally known, Wide Area Telephone Service (WATS) allows the subscriber to purchase a certain number of hours worth of long distance calling time, whether on an incoming line or an outgoing line, for a flat monthly fee. That fee is determined by the *intrastate* tariff rate which is based upon the length of the average user's average call multiplied by the number of calls per month the average user makes. Telephone company customers who receive incoming long distance calls but do not typically make outgoing long

distance calls subscribe to INWATS. INWATS employs the same rate system as WATS for incoming lines but not for outgoing lines. For a more detailed description of WATS, *see In the Matter of AT & T,* 46 F.C.C.2d 81 (1974), and *In the Matter of AT & T,* 37 F.C.C. 688 (1964).

**3.** In fact, David Sperry, an IBT Rate Planning & Administration Officer, testified in the administrative hearings that at the time he was advised of Rogers' request for INWATS in June 1974 he was not aware that Rogers had already obtained two INWATS lines for use in connection with Rogers' one-way paging service. Testimony of David Sperry, IBT Exhibit No. 2, Nov. 26, 1979, at 3. The request for INWATS interconnection to Rogers' machines was apparently not made in writing by Rogers until Sept. 7, 1976. J.A. at 20.

raised in the industry generally as to whether WATS (both inbound and outbound) was compensatory when interconnected with a system that typically produced short times of use, referred to in the industry as "holding times."[4] Specifically, AT & T had conducted studies in 1973 to determine at what point the holding time becomes so short as to render the service noncompensatory to the wireline carrier. The results of these studies were submitted to the FCC with AT & T's January 1974 interstate WATS tariff restructure filing. One of the purposes of that filing was to establish a minimum average time requirement (MATR) in order to ensure that the service would be compensatory as to all users. Use of a MATR would allow the telephone company to structure its INWATS rates to take account, to some extent, of the length of a call. In imposing a MATR of, say, one minute, the telephone company would bill its customer "on the basis of (1) total conversation time, or (2) number of completed calls multiplied by one minute, whichever is greater." If the second alternative is employed, the subscriber is billed "the appropriate additional period charge" for the amount of time the total "exceeds the initial period for the class of service involved."[5]

On July 1, 1974, while Rogers' request for INWATS interconnection was winding its way through IBT and AT & T, the new interstate WATS tariff, complete with a MATR, became effective.[6] Sometime during the summer of 1974, after consulting with AT & T, IBT notified Bernard Kahn, Rogers' Executive Vice President, that Rogers' request for INWATS interconnection to its machines had been denied. Two reasons were given: (1) the holding times for Rogers' calls were so short as to render noncompensatory IBT's provision of INWATS service to Rogers; and (2) such interconnection would violate the resale prohibition contained in the relevant intrastate tariff.[7]

That was not, however, the end of the matter. IBT offered Rogers the option either of interconnecting the *manually-answered* paging service with INWATS or of interconnecting either the manually-answered paging service or the automatic answering *machines* with IBT's foreign exchange (FX) lines. The FX option is, in fact, the very service which IBT uses in connection with its own machine-answered, one-way paging service, "Bellboy."[8] Hence, while declining Rogers' request to expand its INWATS interconnection, IBT (1) left the existing INWATS interconnection in place, (2) offered Rogers precisely

---

**4.** *In the Matter of AT & T,* 37 R.R.2d 519 (1976). Holding times represent the length of time the system is used for each call. The "average holding time" is the basis upon which INWATS rates are structured. The "average" INWATS user has a holding time of approximately 2½ minutes. Rogers' holding time for the manually-answered paging service was between 10 and 12 seconds; for the machine-answered paging service, it was apparently less than 10 seconds. *See* Testimony of David Sperry, IBT Exhibit No. 2, Nov. 26, 1979, at 5, *citing* Testimony of Bernard Kahn before the Illinois Commerce Commission in a July 1976 hearing regarding IBT's INWATS tariff filing, Docket 76–1409.

**5.** 37 R.R.2d at 547. *See supra* note 2.

**6.** As previously indicated, IBT was a subsidiary of AT & T during the period covering the events leading up to this case.

**7.** *See* Testimony of Howard Dalbke, IBT sales representative, J.A. at 572, and Common Carrier Bureau Exhibit No. 1, at 18 (part of the record

but not made part of the J.A.). The Illinois intrastate tariff covering INWATS contained a use of service provision restricting use of INWATS to those nonwireline carriers having a direct interest in the message content of the signal being relayed. IBT officers testified that, at the time Rogers requested INWATS for its machines, they believed this use would violate the resale prohibition. Such use was, in fact, later found to be a violation. IBT did not at that time believe that the manually-answered paging service violated the resale prohibition because the intervention of Rogers' operator, it was thought, gave Rogers a direct interest in the message content of the call. *See* Testimony of David Sperry, IBT Exhibit No. 2, Nov. 26, 1979, at 8. However, this, too, was later found to violate the resale prohibition. *See* IBT Exhibit No. 2, Attachment 1.

**8.** *See* Common Carrier Bureau Exhibit D (part of record below but not made part of the J.A.).

the same service utilized by its affiliate once it went into competition with Rogers,[9] and (3) did not provide INWATS interconnection to its own Bellboy service or to any of Rogers' other competitors.

While the foregoing drama was unfolding in the Chicago metropolitan area, the question of INWATS interconnection continued to loom large at the national level, following on the heels of AT & T's 1973 studies. In 1975, negotiations began between AT & T and RCC representatives (including Rogers' trade association) to address both the need for MATR's in the intrastate tariffs and the concern over the inclusion of one-way paging services within the resale prohibition. On August 24, 1976, the negotiations culminated in a Memorandum of Understanding ("Memorandum") with respect to the MATR. In the Memorandum, the RCC's agreed to the MATR concept in exchange for the specific exclusion of one-way paging services from the resale prohibition.

In March 1977, the FCC formally approved the Memorandum. The compensation and resale prohibition problems having thus been resolved, IBT wrote to Rogers promptly thereafter, on March 18, 1977, offering to interconnect Rogers' machines with INWATS under a rate structure that included a MATR. Rogers, however, chose not to interconnect its machines to IN-WATS once that service became available. Instead, sometime during 1978, Rogers interconnected its machines with IBT-provided FX lines, the same type of service, as we have seen, utilized by IBT's Bellboy service and which IBT had offered to Rogers all along.[10]

In the midst of all this, yet another front opened in the IBT-Rogers relationship. On September 23, 1975, while the industry-wide negotiations between AT & T and the RCC representatives were going forward, IBT petitioned the FCC for authorization to construct eleven new transmitters in the greater Chicago area to be used in connection with its Bellboy service. On November 28, 1975, well over a year after Rogers' request for INWATS interconnection with its machines had been denied, Rogers filed a petition to dismiss or deny its competitor's construction application. The basis for Rogers' petition was that IBT had allegedly acted discriminatorily and anticompetitively in the same geographical area in which IBT sought to expand its service through use of the new transmitters. At the same time, Rogers filed a separate, informal complaint against IBT also alleging discriminatory and anticompetitive behavior. Both Rogers' petition and its informal complaint were denied. Rogers then filed on October 28, 1977, a formal complaint, styled after its informal complaint, but seeking money damages. On October 5, 1978, the Commission issued a Designation Order vacating the Common Carrier Bureau's decision to grant IBT's application. The matter was consolidated with Rogers' formal complaint for purposes of a formal hearing before an Administrative Law Judge in December 1979.

The precise gravamen of Rogers' petition is of some moment in understanding the case as it now reaches us. In its initial complaints, Rogers alleged that IBT's conduct violated the latter's obligations under section 201(a) of the Communications Act,

9. Prior to the granting of IBT's application to construct 11 new transmitters, IBT and Rogers were not competitors in the one-way paging service Outer-Met market. I.D. at 7, J.A. at 18. It was only after the Commission granted IBT's application that IBT began to use its Bellboy to service Outer-Met customers. IBT then encountered the same problem Rogers faced with respect to Outer-Met customers incurring long distance charges in order to access the paging terminal. IBT interconnected its Bellboy with FX lines in order to remedy the situation. In a letter dated February 24, 1976, IBT's Howard

Dalbke informed Rogers' Bernard Kahn that IBT was employing FX lines in connection with its Bellboy service. As the industry negotiations, described in the text in the paragraph that follows, were not consummated until August 24, 1976, the circumstances IBT faced were the same as Rogers did when Rogers was first offered FX interconnection. It is undisputed that IBT never used INWATS to interconnect its own Bellboy service to the telephone network.

10. See supra note 9 and accompanying text.

47 U.S.C. § 201(a) (1976),[11] as elucidated in "*Guardband*," 12 F.C.C.2d 841 (1968), *aff'd sub nom. Radio Relay Corp. v. FCC*, 409 F.2d 322 (2d Cir.1969).[12] Under *Guardband*'s authoritative construction of § 201(a), a telephone company must make available to nonwireline carriers either the same type of service utilized by the telephone company itself (or its affiliates) or a similar service at the same price charged to other nonwireline carriers.

Rogers also raised the possibility, in both its informal and formal complaints, that IBT may have violated the dictates of *Carter v. AT & T*, 13 R.R.2d 597 (1968) ("*Carterfone*") but made no specific allegations explaining or supporting this assertion. After Rogers' petitions were consolidated for review by the ALJ, the reference to *Carterfone* disappeared. Apparently, for this reason, the ALJ made no specific finding with respect to *Carterfone*'s applicability. The ALJ, however, found squarely

against Rogers on its *Guardband* claims. Noting that IBT had offered Rogers the same service that IBT used in connection with its own Bellboy service, and that IBT was not providing INWATS to any of Rogers' other one-way paging service competitors,[13] the ALJ found no violation of *Guardband*. Rogers appealed the ALJ's January 20, 1982 decision[14] to the FCC's Review Board.

In its petition to the Review Board, filed in the spring of 1982, Rogers again raised the *Guardband* issue. Rogers also resurrected its previously inchoate *Carterfone* challenge, asserting, for the first time in the proceedings, that it had been denied its "federally-mandated right" to interconnection in violation of the dictates of *Hush-A-Phone Corp. v. United States*, 238 F.2d 266 (D.C.Cir.1956), *Carter v. AT & T*, 13 R.R.2d 597 (1968) (*Carterfone*), and *In the Matter of Telerent Leasing Corp.*, 45 F.C.

11. The text of 47 U.S.C. § 201(a), in relevant portion, reads as follows:

[I]n cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, [wireline carriers shall be required] to establish physical connection with other carriers ....

12. The *Guardband* case is not styled as such but is commonly referred to in this short-hand fashion to eliminate the necessity of using the lengthy and technical name for this often-cited Commission decision.

13. On page 12 of its Brief to this Court, Rogers asserts that "[d]uring all times relevant to this proceeding, Rogers was not the only customer of IBT with short INWATS holding times. In fact there were other customers of IBT which had shorter average holding times than Rogers." Rogers cites three portions of the record in support of this contention: AT & T Exhibit 2, page 5; Transcript page 237, lines 12–17; and Transcript page 331.

AT & T Exhibit 2, at page 5, discusses pre-1974 circumstances—*i.e.* the climate as it existed before a MATR was included in the interstate WATS tariff filing. At that time, there were *AT & T* customers with average holding times of less than one minute. At page 331 of the Transcript, IBT's Dorethea Schipp testified that while customers such as credit card authorization services did generate large volumes of short holding times, those holding times were not less than one minute. Neither of these record excerpts supports Rogers' contention. The final

citation appears at first glance to support Rogers' claim, stating as it does on pages 236–37 that there were IBT customers with shorter average holding times than Rogers who nevertheless were provided INWATS interconnection. These customers, however, were not engaged in the same type of service as Rogers and their use, unlike Rogers', did not violate the resale prohibition. Transcript at 236.

14. In its exceptions to the ALJ's initial decision, Rogers alleged a number of procedural errors concerning, among other things, the ALJ's refusal to admit certain testimony and other evidence. The Review Board found against Rogers on each of its procedural challenges, and Rogers did not appeal these findings in its application for Commission review. Rogers now attempts to resurrect these same claims. The Commission and IBT correctly assert that Rogers' failure to assert these claims before the Commission constitutes a waiver. In *Fidelity Television, Inc. v. FCC*, 515 F.2d 684, *cert. denied*, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975), this court held that because the appellant had failed to appeal a Review Board ruling to the Commission, it "failed to exhaust its administrative remedies" and therefore "the Review Board's determination is not properly before this court." 515 F.2d at 696. We are unpersuaded by Rogers' unsupported contention that it is not required to raise each and every claim before the Commission in order to preserve the issue for appeal. Accordingly, we see no need for a more elaborate discussion of these presumptively unmeritorious claims.

C.2d 204 (1975).[15] While entertaining Rogers' *Carterfone* interconnection issue, the Review Board found against Rogers on both points, upholding the ALJ's finding that IBT had not engaged in predatory, anticompetitive behavior and determining that no *Carterfone* issue even existed. The rationale for the latter holding was simple and straightforward: Rogers was offered the same FX interconnection that IBT utilized; nonetheless Rogers refused that service on the ground that it was more expensive than INWATS at intrastate tariff prices. In consequence, the Review Board concluded, the dispute was, in effect, an intrastate rate dispute, not an interconnection dispute. The Board was unpersuaded by Rogers' characterization of its claim as a *Carterfone* issue, inasmuch as Rogers was not, as in *Carterfone*, denied interconnection for the sole reason that its machines were not telephone company equipment. Indeed, in the Review Board's analysis, there had been no outright denial of interconnection at all, since, as we have already seen, IBT made readily available to Rogers the FX service that IBT itself utilized and made available to other competitors.

Undaunted, Rogers petitioned the Commission for review. In a brief, two-page order, the Commission denied the petition on October 10, 1983, finding "no compelling reason presented here warranting the application of *Carterfone*." The FCC also upheld the Review Board's determination that IBT "had a valid business justification for refusing to permit Rogers to interconnect" on the grounds that the determination "is fully supported by the record evidence in this proceeding." FCC Order, Oct. 21, 1983, J.A. at 1. Rogers now petitions this Court for review.

## II

Taking the issues as they arose in the agency proceedings, we first consider the issue of IBT's allegedly anticompetitive, discriminatory treatment of Rogers. Following our treatment of that question, we will then turn to the question of Rogers' rights *vel non* under *Carterfone*.

### A

▇ Section 201(a) of the Communications Act governs the duties owed by a wireline carrier, such as IBT, to nonwireline carriers, such as Rogers. 47 U.S.C. § 201(a) (1976). Under section 201(a), wireline carriers are required to provide nonwireline carriers with interconnection "in cases where the Commission, after opportunity for hearing, finds such action ... in the public interest." *Id.* In construing section 201(a), this court, in *Southern Pacific Communications Co. v. American Telephone & Telegraph Co.*, 740 F.2d 980 (D.C.Cir.1984), recently held that carrier-to-carrier interconnection duties must be resolved under section 201(a)'s public-interest standard rather than under traditional antitrust standards. *Southern Pacific* further held that if a refusal to interconnect is based on public-interest considerations, no violation of the Communications Act occurs even if the effect of the refusal is anticompetitive. At 1009. The public-interest standard, according to the court, is essentially one of reasonableness.

The Commission itself has articulated standards which wireline carriers must meet in responding to nonwireline carriers' requests for interconnection. Specifically, as we have seen, in its 1968 *Guardband* decision the Commission required wireline carriers to make available to nonwireline carriers the same type of interconnection, and at the same price, as the wireline carrier itself uses. *Guardband*, 12 F.C.C.2d at 852.

After reviewing the ALJ's findings of fact, which were affirmed by the Review Board and the Commission, we can divine no basis whatever for overturning the decision that IBT, in refusing to provide *additional* INWATS lines to Rogers, acted in a reasonable manner and in the public interest, and that no violation of the *Guard-*

---

**15.** *See* Petitioner's Brief at 18. Throughout the remainder of this opinion, the *Hush-A-Phone*, *Carterfone*, and *Telerent* decisions will typically be referred to collectively as *Carterfone*.

*band* standards occurred.[16] First, it cannot reasonably be disputed that IBT could provide INWATS interconnection to Rogers' machines only at a loss.[17] If IBT were to incur such a loss, it is also undisputed that it would be necessary to offset that loss by increased charges to other IBT customers. It simply cannot reasonably be said that the ALJ erred in finding that IBT's refusal to require, in effect, its other customers to subsidize Rogers was reasonable and in the public interest. Furthermore, it is now undisputed that IBT satisfied *Guardband*'s standards by offering to provide Rogers with interconnection to the FX service which IBT itself used to interconnect its own one-way paging system.

Moreover, it is clear from the very existence of the negotiations between AT & T and RCC representatives (which led eventually to the Memorandum of Understanding embracing the MATR concept) that the short holding time problem resulting from use of INWATS by one-way paging systems was not contemplated when the local tariff rates were originally established in 1961. In light of these circumstances and given the fact that IBT was not providing INWATS interconnection to *any* machine answered, one-way paging system without a MATR, the ALJ was correct in holding that IBT met the same-service-and-charge requirements of *Guardband*.

### B

Having lost on the discrimination issue before the ALJ, Rogers attempted to buttress its case with a more specific allegation of a *Carterfone* violation than that articulated in its informal and formal complaints. Rogers appealed to the Review Board, asserting not only that IBT had behaved anticompetitively, but that IBT had denied Rogers its "federally-mandated right" to interconnection when it refused to provide INWATS interconnection at tariff rates. Rogers asserted before the Review Board and the full Commission, and renews the contention here, that *Carterfone* established an absolute right on its part to interconnection with each and every form of service. Both the Review Board and the Commission ruled against Rogers on this claim for the reason that Rogers was not denied interconnection *per se*. Instead, Rogers was offered FX interconnection rather than INWATS, consistent with *Guardband*. Since FX is more expensive than INWATS, the Review Board, as we have seen, determined that no interconnection dispute existed but rather a disagreement over rates. In addition, the Commission noted that what it deemed to be in essence a rate controversy presented an issue that is *intrastate* in nature, triggering state, not federal, jurisdiction. Hence, under this reasoning, *Carterfone* was inapplicable and the Commission lacked jurisdiction over this specific aspect of Rogers' challenge.

We find fully supported the ALJ's findings placing IBT's actions with respect to Rogers' request for *additional* INWATS lines outside *Carterfone*'s proscriptions. In the *Carterfone* line of cases, it was recognized that the telephone company could in fact lawfully refuse a request for interconnection. Indeed, while proscribing telephone company prohibitions against "harmless" interconnections, *Carterfone*

---

**16.** It is necessary to return to the ALJ's findings because, at the Review Board stage, the focus of the case shifted from satisfaction of the *Guardband* standards for competition to whether, under *Carterfone,* an absolute, federally-mandated right exists to the form of interconnection of one's choosing.

**17.** Rogers asserts in its Brief that the evidence suggests that the *only* business justification for IBT's refusal to allow machine interconnection to INWATS is that the machine would be less expensive for Rogers. Brief at 15. In effect,

Rogers claims that there is no evidence to support the ALJ's finding of business justification. This is simply not true. *See* J.A. at 23–24. This assertion is based upon Rogers' erroneous belief that IBT's entire business must be in the red before the noncompensatory nature of any service can be raised as a business justification. See *infra,* note 18. Nevertheless, Rogers does not dispute that IBT's provision of INWATS *to Rogers* is noncompensatory, but rather disputes the significance of that fact.

expressly recognized the telephone company's right to refuse interconnection to avoid detriment to the public or adverse effects on the telephone system.[18] Under this standard, IBT's refusal to provide Rogers with additional INWATS lines when such a service would be noncompensatory to IBT is not inconsistent with *Carterfone.*

■ However, one remaining problem is the FCC's treatment of IBT's refusal to allow Rogers to interconnect its machines with the two INWATS lines which had previously been installed at Rogers' place of business. Having already provided these lines to Rogers, which Rogers used in connection with its manually-answered, one-way paging system, IBT's refusal to allow Rogers to use the lines in connection with its machine-answered, one-way paging system could, it might be argued, move this case closer to the concerns informing *Carterfone.* While sufficient evidence was arguably adduced before the ALJ to support his finding that IBT was not required under *Carterfone* to permit use of the already-installed INWATS lines in connection with Rogers' machines, no specific finding was made by the Commission as to this narrow but highly relevant point. According to the ALJ's findings, IBT learned—after the fact—that Rogers was utilizing INWATS lines in connection with its one-way paging service. Upon discovering this, IBT chose not to terminate those services, but at the same time the telephone company refused to permit interconnection with the automatic machine-answered system. IBT argued before the ALJ, as it argues now, that the continued provision of the INWATS service was reasonable, given the telephone company's desire not to inconvenience Rogers' customers, and that doing so pending the outcome of the NARS negotiations was a proper, judicially-sanctioned practice. Brief at 14 n. 36.

While we do not necessarily disagree with IBT's analysis, which is accepted on appeal by the FCC, we are nevertheless mindful of the absence of anything in the *Commission's* cursory, two-page order addressing this point. It could be argued that, for instance, having made the decision not to interrupt INWATS service to Rogers' paging customers, IBT committed itself to the provision of *full* INWATS service—*i.e.* for manually-answered and machine-answered calls alike as to the two lines already in place. This omission in the Commission's analysis takes on greater significance, inasmuch as the record evidence is not clear beyond dispute that machine-answered calls are materially shorter than the already brief operator-answered calls.[19]

18. The ALJ's finding of a legitimate business justification satisfies the adverse-effects standard. Rogers argues that if a business justification can excuse a telephone company's refusal to provide communication, the only possible satisfactory business justification for IBT's refusal to provide INWATS interconnection to Rogers' machines would be that IBT's business *as a whole* would be noncompensatory, *New York & Queens Gas Co. v. McCall,* 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337 (1917), or that IBT's "operations or the telephone system's utility for others" would be adversely affected. *Carter v. AT & T,* 13 F.C.C.2d 419, 424 (1968). Rogers mistakes the holding of *McCall.* The Supreme Court, in that case, upheld a state Commission order requiring the gas company to extend its line one and one-half miles in order to service a rapidly growing new settlement. The Court specifically relied upon the fact that, while the return upon the investment would be low initially, there was "every prospect of its soon becoming ample." 245 U.S. at 350, 38 S.Ct. at 124. The Court went on to note *in dicta* that had the gas company demonstrated that what appeared to be a comparatively small loss did in fact constitute a hardship sufficiently great to "render its business as a whole unprofitable," the case might have been decided differently. *Id.* at 351, 38 S.Ct. at 124. This is scarcely the equivalent of *holding,* as Rogers would have it, that unless the specific loss renders the business as a whole unprofitable, it cannot outweigh countervailing considerations.

Rogers' reliance on *Carterfone* in this respect is similarly misplaced. The quoted language from *Carterfone* does not aid Rogers' argument. The noncompensatory nature of INWATS service to companies with short holding times had an adverse effect on both IBT's operations and its utility to others who must pay higher rates to offset IBT's loss.

19. IBT in its brief states that the average access call to an RCC one-way paging system, such as Rogers, lasted only ten to twelve seconds and *probably less* for machine-answered calls. Brief at 8–9. IBT goes on to rely on Rogers' response to an interrogatory that "machine answering is

If neutral business reasons warranted the refusal to provide any INWATS service pursuant to regular tariff rates, then those reasons [20] would seemingly also justify the termination of the INWATS service.

Our concern about the silence of the FCC's order in this respect is heightened by the FCC counsel's indication at oral

faster ... than manual operation." While there may be record evidence, as well as common sense, to support IBT's proposition, *see supra* note 13, it is nonetheless the case that we do not have the benefit of the Commission's reading of the record on this specific point. Even in its Brief, the FCC waffles on this point, stating that the Review Board *"appeared to accept* IBT's argument that the holding time would be even less if ... Rogers had been given the automatic interconnection it had sought." Commission Brief at 14 (emphasis added).

**20.** To be sure, evidence was adduced before the ALJ suggesting that use of the two INWATS lines for machine-answered calls was even more noncompensatory than use of those same lines for manually-answered calls. According to studies conducted by IBT, the average holding time for Rogers' manually-answered paging calls is twelve seconds. AT&T Exhibit No. 1, at 16, J.A. at 24. In addition, the studies conducted by AT&T on short holding times, the results of which, as we have seen, were filed with AT&T's January 1974 interstate tariff restructure filing, demonstrated the noncompensatory nature of a twelve-second call. Testimony of Dorothea Schipp, AT&T Exhibit No. 2, Attachment 4, Nov. 26, 1979. The results of the study produced the following cost comparison chart:

| Length of Conversation | Set-Up Cost | Conversation Time Cost | Total Cost | Revenue | (Loss) Gain/Call |
|---|---|---|---|---|---|
| 10 Sec. | .137 | .016 | .153 | .037 | (.116) |
| 20 Sec. | .137 | .032 | .169 | .073 | (.094) |
| 60 Sec. | .137 | .095 | .232 | .220 | (.012) |
| 66 Sec. | .137 | .105 | .242 | .242 | (.000) |
| 174 Sec. (2.9 Min.) | .137 | .275 | .412 | .638 | .226 |

Rogers did not challenge the results of these studies. Quite to the contrary, Rogers' Executive Vice President, Mr. Kahn, testified before the Illinois Commerce Commission in July 1976 in the IBT general rate case that the average holding time of "direct" (machine) interconnection calls would be less than the average holding time of manual (operator answered) interconnection calls. See Testimony of David Sperry, IBT Exhibit No. 2, Nov. 26, 1979, at 5 (citing Testimony of Bernard Kahn before the Illinois Commerce Commission in a July 1976 hearing regarding IBT's INWATS tariff filing, Docket 16–0409). Rogers made no objection to the

argument that IBT would not have suffered *any* additional economic detriment if Rogers had interconnected its machines instead of using operators. If that is so, then it is not at all clear that the business justification of the noncompensatory nature of the service would obtain in refusing to permit interconnection with the two ex-

introduction of this testimony at the hearings. Mr. Kahn's previous testimony came out during the cross-examination of Mr. Sperry, an IBT witness, and no objection was made on hearsay grounds or otherwise. The evidence, therefore, was properly made part of the record.

In this context, even a few seconds could create a not insubstantial change in the degree to which the service is rendered noncompensatory. Mr. Sperry of IBT testified that the INWATS user pays a flat rate of $1.15 per six minute time period (.1 hour). The average INWATS user makes two and one-half calls during that time interval. With a ten second holding time, for example, the user would, in stark contrast, make 36 calls during that time period. To set up each call requires 11 seconds of the network's time and the use of three central office switching machines. The cost associated with setting up each call would be incurred 36 times every six minutes for the user with a 10 second holding time but only two and one-half times for the average user. Yet, the revenue remains constant. *See* the cost comparison chart *supra.* Given that Rogers had 5000 pages in service in 1974 and 17,000 by 1978, the multiplier for the increase in the gap between cost and revenues associated with even a one second difference between machine and manually-answered calls is arguably not insubstantial.

An examination of the capabilities of the machine used by Rogers demonstrates an even greater risk of increasing the noncompensatory nature of the service. The Metro-100 machine, manufactured by Motorola, is not only a high-speed machine, but it is also a high capacity paging terminal. This means that it can turn over calls quickly; and it has the capacity to store a vast number of different codes in its memory. According to Mr. Dalbke's testimony, the Metro-100 could "handle up to 100,000 paging receivers" (*i.e.,* store up to 100,000 codes). Testimony of Howard Dalbke, IBT Sales and Service Representative, Hearing Transcript, Dec. 10, 1979, at 211. With such a high memory capacity, use of the machine could aid Rogers in expanding its customer base, thereby increasing the noncompensatory nature of the service through increases in volume.

IBT also relied on the prohibition against resale set forth in its state-filed tariffs for not permitting automatic answering devices to be interconnected to the INWATS service. But the FCC expressly rejected that ground in its order.

isting INWATS lines.[21] There might be other reasons for refusing to apply *Carterfone* under the circumstances, such as the undisputed fact—relied upon by the FCC in its order—that *Carterfone* has never been applied to a purely intrastate case. However, we are left with the fact that the business-justification rationale was the only reason advanced by the Commission to support its determination. The absence of any express finding by the FCC either (1) that machine interconnection was more noncompensatory than manually-answered paging interconnection, or (2) that other reasons besides IBT's business justification supported the Commission's refusal to apply *Carterfone*, leaves the Commission's order as to this single issue without any support.

We have, in short, been unable to clearly discern the agency's path [22] from the several opinions below and the voluminous record itself on the issue of *Carterfone*'s applicability to the two INWATS lines already in service at Rogers' place of business. We therefore conclude that the Commission must now address expressly the single lingering issue in this case, namely whether the refusal by IBT prior to August 1978 to permit machine interconnection with the two existing INWATS lines was reasonable and lawful. Our conclusion in this respect does not, however, warrant overturning the Commission's order granting the telephone company's application to construct eleven new transmitters to expand its own one-way paging service. We have found no basis for disagreeing with the determination that a grant of the application, and the consequent expansion of the services available to the public in the Chicago metropolitan area, would serve the public interest, convenience, and necessity. Review Board Decision at 9, J.A. at 11.

For the foregoing reasons the petition is denied in part, granted in part and the case remanded for further proceedings.

*It is so ordered.*

---

**21.** *But see supra,* note 20.

**22.** In the words of Judge Leventhal,
[i]f satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agen-

cy's path may reasonably be discerned, though of course the court must not be left to guess as to the agency's findings or reasons. *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970).